RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 05a0151p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

        *Plaintiff-Appellant/*
*Cross-Appellee,*

        Nos. 03-5672/5685

    *v.*

ANTONIO L. FORREST,

        *Defendant-Appellee/*
*Cross-Appellant.*

---

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 02-00078—Edward H. Johnstone, District Judge.

Argued: August 3, 2004

Decided and Filed: March 30, 2005

Before: NELSON and COOK, Circuit Judges; ROSEN, District Judge.[*]

---

### COUNSEL

**ARGUED:** Terry M. Cushing, ASSISTANT UNITED STATES ATTORNEY, Louisville, Kentucky, for Appellant. James A. Earhart, Louisville, Kentucky, for Appellee. **ON BRIEF:** Terry M. Cushing, Michael A. Bennett, ASSISTANT UNITED STATES ATTORNEYS, Louisville, Kentucky, for Appellant. James A. Earhart, Louisville, Kentucky, for Appellee.

---

### OPINION

---

    DAVID A. NELSON, Circuit Judge. This is a federal criminal case that stems from the armed robbery of a convenience store by the defendant and two others. Found guilty by a jury, the defendant was sentenced to imprisonment for one year on a Hobbs Act charge and seven years — the statutorily mandated minimum — on a charge of brandishing a firearm in the commission of the robbery.

---

[*]The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

The Hobbs Act sentence reflected both a reduction in the defendant's sentencing guidelines offense level for acceptance of responsibility and a downward departure from the guideline range. The departure was based on the proposition that, as the defendant argued, "this is not the typical federal robbery case" — it is a case, according to the defendant, that would not have been prosecuted in a federal court but for the defendant's unwillingness to plead guilty to a robbery charge brought against him earlier in a state court.

Had there been no sentence adjustments under the guidelines, and given that the defendant was sentenced at a time when the guidelines were being applied as mandatory, the district court would have been required to sentence the defendant to at least 33 months for the Hobbs Act violation — a sentence nearly three times as long as the 12-month sentence he actually received. The government has appealed the defendant's sentence, and the defendant has appealed his conviction.

The conviction will be affirmed. As to the sentence, we agree with the government that the district court erred in its understanding of the sentencing guidelines. The case will be sent back for resentencing, with the guidelines — construed in accordance with this opinion — to be taken into account by the district court, but no longer to be treated as mandatory. See *United States v. Booker*, 125 S.Ct. 738 (2005).

I

The defendant, 19-year-old Antonio Forrest, joined two other young men — Blake Jones and Randy Banks — in robbing a Louisville convenience store in January of 2002. Jones and Banks carried loaded handguns, and Mr. Forrest carried what he says was a toy cap gun. (The cap gun was never recovered, but the weapons carried by Jones and Banks — a revolver and a semi-automatic pistol — were recovered and were placed in evidence at Forrest's trial.)

A store employee named Mohamad Tariq was manning a cash register at the time of the robbery. A second register was being worked by an employee named Mohamad Arif. Cursing and brandishing their guns, the robbers forced a third employee and several customers to lie down on the floor, while Tariq and Arif were importuned, in the foulest of language and at gunpoint, to hand over the store's money. One of the robbers threatened to kill the obviously terrified Tariq if he didn't hurry up in opening his cash register. Approximately $400 was taken, some of it in the form of rolled coins, and the robbers ran out of the store carrying the money in a plastic bag.

Mr. Arif called 911, and officers of the Louisville police department responded to the call. One of the officers saw three men running. After giving chase, he succeeded in apprehending Blake Jones. Jones was taken back to the store and identified as one of the robbers.

A short time later an officer with a tracking dog discovered the defendant, Antonio Forrest, lying on his back in an apartment building alcove not far from the convenience store. A plastic bag containing rolled coins was found near Forrest, and a total of $391 was recovered from his person. In his pocket was the stub of a $190.64 paycheck. Forrest too was taken back to the store, and Tariq identified him as one of the robbers. Randy Banks, the third robber, evaded capture by the Louisville police, but he was eventually picked up on unrelated charges in another state.

After being identified at the convenience store, Jones and Forrest were taken to police headquarters. There Jones gave a confession. Both men were charged with first degree robbery under Kentucky law, and they were subsequently indicted for that crime by a Kentucky grand jury. They pleaded not guilty.

In June of 2002 a federal grand jury handed up a two-count indictment charging Forrest and Jones with obstructing interstate commerce by robbery, a violation of the Hobbs Act, 18 U.S.C.

§ 1951(a), and with brandishing firearms during and in relation to a crime of violence, a violation of 18 U.S.C. § 924(c)(1)(A).  These charges were based on the same episode that formed the basis of the Kentucky indictment.  Forrest contends — and the government as much as admits — that the federal indictment resulted from the defendants' refusal to plead guilty to the state charge.  Both men initially pleaded not guilty to the federal charges as well.

Prior to his indictment by the federal grand jury, Forrest had been kept in a Kentucky jail cell because of his inability to make bond on the state robbery charge.  At the time of the federal indictment he was transferred to the custody of the United States under a writ of *habeas corpus ad prosequendum.*  Following a detention hearing, a federal magistrate ordered that Forrest be released on an unsecured bond subject to the condition that he be confined at home with electronic monitoring.  Forrest was then returned to the Kentucky jail, apparently because he had been transferred from state custody under a writ.  Forrest remained in jail for several days, at which point the state robbery charge was dismissed.

Forrest moved for dismissal of the federal charges on the ground that his return to state custody violated the Interstate Agreement on Detainers Act, 18 U.S.C. App. 2, § 2.  The district court denied the motion.

Blake Jones pleaded guilty to the federal charges prior to trial and agreed to cooperate with the prosecution.  Antonio Forrest stuck with his plea of not guilty.

The case against Forrest proceeded to trial in January of 2003.  During jury selection, at a time when there was only one African-American (a woman) on the panel of prospective jurors, the government exercised a peremptory challenge against her.  Forrest —  also an African-American — moved for a mistrial, but the motion was denied.

The testimony of Blake Jones formed a major part of the government's case against Forrest. Jones named Forrest as a participant in the robbery, along with himself and Banks.

Forrest did not take the stand at trial, but his attorney argued to the jury that Jones was lying and that Forrest had simply had the misfortune of being at the wrong place at the wrong time.  The jury did not see it that way, and Forrest was found guilty of both of the charges against him.

Forrest moved for a new trial on the ground that in final argument the prosecutor had commented improperly on his decision not to testify.  The motion was denied.

Prior to sentencing Forrest was interviewed by a United States Probation Officer.  Forrest acknowledged to the probation officer that he had been a participant in the robbery.  He said that the idea for robbing the convenience store had originated with Banks, the man who had the semi-automatic pistol.  Jones carried the revolver during the robbery, according to Forrest, while he himself carried a toy cap gun that he subsequently threw away while running from the police.

The probation officer prepared a presentence investigation report in which, among other things, he recommended that Forrest's sentencing guidelines offense level be reduced under U.S.S.G. § 3E1.1 for acceptance of responsibility.  "It appears that the defendant went to trial to assert and [preserve] issues that do not relate to factual guilt," the probation officer wrote, adding that "the defendant has admitted his involvement in the instant offense to the U.S. Probation Officer."  The government objected to the proposed acceptance-of-responsibility adjustment, but the district court overruled the objection.

Mr. Forrest had no criminal history points, which meant that the sentencing guidelines placed him in Criminal History Category I.  As calculated by the district court, and with the acceptance-of-responsibility adjustment included, the guideline range for Mr. Forrest's  Hobbs Act offense was

imprisonment for between 27 and 33 months.  Mr. Forrest asked the court to depart downward from the guideline range.  The court did so, moving down 5 more notches on the "Offense Level" scale of the sentencing table and imposing a 12-month sentence.  With respect to the firearm conviction, the relevant statute mandated the imposition of a term of imprisonment for not less than 84 months, to run consecutively to the other sentence.  See 18 U.S.C. § 924(1)(A)(ii).  The court imposed the mandatory minimum, so Forrest's total sentence came to 96 months.

The government filed a timely notice of appeal, and Mr. Forrest took a timely cross-appeal.  The government's appellate brief contends that the district court erred both in  reducing the defendant's offense level for acceptance of responsibility and in departing downward from the sentencing range prescribed by the guidelines.

Mr. Forrest denies that the sentence reductions were erroneous, but he claims error in four other respects.  Forrest contends (1) that the government violated his rights under the Interstate Agreement on Detainers, (2) that the government violated his Fifth Amendment right against self-incrimination by commenting on his failure to offer proof on various subjects, (3) that the government failed to present sufficient evidence that the two weapons admitted as trial exhibits qualified as "firearms," and (4) that the government violated his rights under *Batson v. Kentucky*, 476 U.S. 71 (1981), when it excused the African-American woman from the jury panel.

We heard oral argument in this case last August.  By that time the United States Supreme Court had granted certiorari in *United States v. Booker*, No. 04-104, and *United States v. Fanfan*, No. 04-105, both of which involved Sixth Amendment challenges to the sentencing guidelines in light of *Blakely v. Washington*, 542 U.S. __ (2004).  Counsel for the parties recommended at oral argument that we defer the issuance of our opinion until after resolution of the issues presented in *Booker* and *Fanfan*.  The Supreme Court's decision in those cases came down in January of this year.

For reasons to be explained shortly, we conclude that none of Mr. Forrest's assignments of error is meritorious.  The government's challenges to the district court's application of the sentencing guidelines are well taken, we conclude, notwithstanding that *Booker* has now invalidated the provisions of the Sentencing Reform Act that made the guidelines mandatory. Sentencing courts must still take the guidelines into account and must construe the guidelines properly in doing so.  On remand it will be up to the district court to determine (subject to the possibility of review by this court for reasonableness) what sentence  Mr. Forrest should receive under the post-*Booker* dispensation, taking into account what the guidelines say in their precatory voice and giving appropriate consideration to the statutory factors that have always been relevant under the Sentencing Reform Act of 1984.  See 18 U.S.C. § 3553(a).

II

Before analyzing the sentencing issues, we turn to Mr. Forrest's assignments of error.  As noted above, there are four of them.

A

Forrest argues first that the government violated the Interstate Agreement on Detainers, 18 U.S.C. App. 2, § 2, by returning him to state custody before trying him in federal court.  The "anti-shuttling" provision of the Agreement ordinarily requires dismissal of charges by the "receiving state" if that state does not try the prisoner before returning him to the "sending state."  See 18 U.S.C. App. 2, § 2, art. III(d); *United States v. Taylor*, 173 F.3d 538, 540 (6th Cir.), *cert. denied*, 528 U.S. 987 (1999).  When the United States is the receiving state, however,

> "it shall not be a violation of the agreement on detainers if prior to trial the prisoner is returned to the custody of the sending State pursuant to an order of the appropriate court *issued after reasonable notice to the prisoner and the United States and an opportunity for hearing*."   18 U.S.C. App. 2, § 9.   (Emphasis supplied.)

Mr. Forrest's contention is that he was not given the notice and opportunity for a hearing required by the statute.

Whether or not Forrest had notice and an opportunity to be heard, we conclude that there was no violation of the Interstate Agreement on Detainers.   It is clear, under our caselaw, that the Agreement applies only to "prisoners who have begun serving their [state] sentence and not to [state] pre-trial detainees."   *United States v. Wilson*, 27 F.3d 1126, 1130 (6th Cir.), *cert. denied*, 513 U.S. 976 (1994); see also *United States v. Roberts*, 548 F.2d 665, 670-71 (6th Cir.), *cert. denied*, 431 U.S. 931 (1977).   Forrest was never convicted in the state court; as far as Kentucky was concerned, he was a pretrial detainee at the time he was "shuttled" between state and federal custody.

Mr. Forrest suggests that the Supreme Court's decision in *Alabama v. Bozeman*,  533 U.S. 146 (2001), undermines *Wilson* and *Roberts*.   But *Bozeman* does not address the question of whether the Interstate Agreement on Detainers applies to state pretrial detainees.   At most, *Bozeman* casts doubt on one basis for this court's holdings, *i.e.*, a determination that the Agreement is designed to minimize interruption of "programs of treatment and rehabilitation."   *Roberts*, 548 F.2d at 670-71; see also *Bozeman,* 533 U.S. at 154-56.   There is another basis for the *Wilson* and *Roberts* holdings, however: the plain language of the Agreement.   By its terms, the Agreement applies only to persons who have "entered upon a term of imprisonment in a penal or correctional institution of a party State."   18 U.S.C. App. 2, § 2, art. III(a); see also *Roberts*, 548 F.2d at 671.   Mr. Forrest had not entered upon such a term of imprisonment, and *Bozeman* does not require his release.

B

The second argument advanced in the cross-appeal is that the prosecutor improperly commented on Forrest's decision not to testify at trial.   The comments in question came in the government's rebuttal argument to the jury.   Responding to the defense lawyer's suggestion that Forrest had fallen to the ground when "attacked" by the tracking dog (*i.e.*, that Forrest had not lain down in an effort to hide from the police), the prosecutor said this:

> "Mr. Earhart talked about Mr. Forrest lying down in this alcove.  He's telling you that he fell down when the dog approached him.  What evidence, ladies and gentlemen, is there of that?  Mr. Earhart wanted to talk to you about evidence and what evidence you had and what evidence you don't.  Did you hear any evidence at all about Antonio Forrest falling down?  Where did he fall down from? . . . Where did he come from?  Is there any evidence about where he came from?  There's only one piece of evidence about that, and that evidence is the robbers ran through here and up to there.  That's the only evidence about where Antonio Forrest went or came from.  There's no other evidence about that."

In addition, responding to the defense lawyer's argument that the $391 found on Forrest was Forrest's own money, the prosecutor had this to say:

> "Mr. Earhart told you about Antonio Forrest cashing a check.  We do have a check stub, but as Mr. Earhart told you, Mr. Forrest had more money in his pocket than what that check stub represents.  Where did the other money come from?"

Our first task in assessing this assignment of error is to determine whether the prosecutor's comments were improper.   See *United States v. Carroll*, 26 F.3d 1380, 1387 (6th Cir. 1994).   If they

were improper, we must then decide whether the impropriety was so flagrant as to require reversal. See *id.* at 1389.

It does not appear to us that the prosecutor's comments were improper. They were made in response to factual theories presented in the closing argument for the defense, and the prosecutor was entitled to point out the lack of evidence supporting those theories. See *United States v. Tarwater*, 308 F.3d 494, 511 (6th Cir. 2002)(holding that the prohibition against commenting on a criminal defendant's silence "does not extend to a defendant's failure to call a witness or to otherwise present exculpatory evidence"). The defense theories, if valid, might well have been supported by evidence from third-party witnesses, and the prosecutor's comments on the absence of supporting evidence did not improperly highlight Forrest's failure to take the stand himself.

Even if the comments were improper, moreover, they were not so flagrant as to require reversal. Flagrancy is a function of four factors: (1) whether the prosecutor's comments tended to mislead the jury or to prejudice the defendant, (2) whether they were isolated or extensive, (3) whether they were deliberate or accidental, and (4) whether the evidence against the defendant was otherwise strong. *Carroll*, 26 F.3d at 1385, 1387. We do not believe that the comments at issue here were likely to mislead the jury or to prejudice Mr. Forrest unfairly. They were not accidental, but neither were they extensive. Moreover, the evidence against Forrest – which included the inculpatory testimony of another of the robbers – was very strong indeed. If there was an error here, it did not rise to the level of reversible error.

C

In his next assignment of error, Mr. Forrest submits that the government failed to present sufficient evidence that the revolver and semi-automatic pistol used in the robbery were "firearms" within the meaning of federal law. Although the weapons themselves were introduced as exhibits, Forrest contends that the government was obligated to present evidence of their "operation or functionality." He relies on 18 U.S.C. § 921(a)(3), which defines "firearm" as "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive . . . ."

Forrest's argument has no merit. The jury had the actual weapons before it, and there was testimony that the weapons were loaded when recovered by the police. The jury could reasonably conclude that the weapons were capable of firing a projectile, or at least that they had been designed for that purpose.

D

Mr. Forrest's final argument, based on *Batson v. Kentucky*, 476 U.S. 79 (1986), is that the government violated his due process and equal protection rights by striking the lone African-American from the jury pool. To establish an equal protection violation under *Batson*,

> "the claimant must first establish a *prima facie* case of racial discrimination. If the claimant establishes a *prima facie* case, the party exercising the peremptory must proffer a race-neutral explanation. This non-racial explanation 'need not be particularly persuasive, or even plausible, so long as it is neutral.' After the defending party offers its race-neutral justification, the challenging party must demonstrate that the purported explanation is merely a pretext for a racial motivation. As with discrimination claims generally, the ultimate burden of persuasion always rests with the party challenging the peremptory." *McCurdy v. Montgomery County, Ohio*, 240 F.3d 512, 521 (6th Cir. 2001) (citations omitted).

Here the government offered two race-neutral reasons for its decision to excuse the juror in question: (1) she had a record of criminal charges, and (2) she exhibited an "extreme negative reaction" to being called as a juror. The district court found that National Crime Information Center records supported the government's first reason. As to the second, "body language and demeanor are permissible race-neutral justifications for the exercise of a peremptory." *McCurdy*, 240 F.3d at 521. Mr. Forrest failed to show that the government's explanation was a pretext for racial discrimination, and we have no basis for second-guessing the district court's refusal to grant a mistrial.

### III

Having concluded that Forrest's conviction must be affirmed, we turn to the government's appeal of the 12-month sentence imposed with respect to the Hobbs Act count.[1]  As we have said, the government challenges both the granting of an offense-level reduction for Forrest's eleventh-hour acceptance of responsibility and the granting of a downward departure on the basis of the atypicality of the prosecution of a garden-variety convenience store robbery in federal court under the Hobbs Act.

### A

U.S.S.G. § 3E1.1(a) directs (or perhaps we should now say "invites") a sentencing court to decrease the defendant's offense level by a stated amount "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." A determination that a defendant has accepted responsibility was not to be disturbed on appeal, under the pre-*Booker* scheme of things, unless clearly erroneous. See *United States v. Surratt*, 87 F.3d 814, 821 (6th Cir. 1996).

The Sentencing Commission has explained that § 3E1.1 "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1, comment. (n.2). The application note containing this statement goes on to say that "[c]onviction by trial, however, does not automatically preclude a defendant from consideration" for a § 3E1.1 reduction:

> "In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt . . . . *In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.*" *Id.* (Emphasis supplied.)

Mr. Forrest asserts that he went to trial to preserve issues unrelated to factual guilt, namely (1) an issue as to the admissibility of the identification made by Mr. Tariq (an issue that was mooted

---

[1]The Hobbs Act provides, in pertinent part, that "[w]hoever in any way or degree obstructs, delays, or affects [interstate] commerce . . . by robbery . . . or threatens physical violence to any person . . . in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both." 18 U.S.C. § 1951(a).

Section 1951(b) goes on to define the term "robbery," as used in the Hobbs Act, as meaning "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury . . . to his person . . . ."

In neither the district court nor this court has Mr. Forrest ever raised any question as to the existence of federal jurisdiction over this case pursuant to the Hobbs Act.

when the identification was not used at trial) and (2) his claim that the government violated the Interstate Agreement on Detainers Act. The record shows, however, that Forrest vigorously disputed his factual guilt at trial, arguing, through counsel, that Blake Jones "lied" in testifying that Forrest had participated in the robbery; that Forrest was "simply a victim of being in the wrong place at the [wrong] time;" and that the rolled coins in the plastic bag and the funds found on his person were his own money.

It seems clear that Mr. Forrest did not admit guilt until after his conviction. He put the government to its proof by denying the essential factual elements of guilt, and § 3E1.1 was thus not intended to apply to him. This is not one of the "rare situations" contemplated by the commentary to § 3E1.1, where, through "pre-trial statements and conduct," the defendant has "clearly demonstrate[d] an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to trial." See U.S.S.G. § 3E1.1, comment. (n.2). Forrest has simply not identified any "pre-trial statements and conduct" showing an acceptance of responsibility. *Cf. United States v. Angel*, 355 F.3d 462, 477 (6th Cir. 2004). As we see it, therefore, the district court's decision to grant the sentence reduction under § 3E1.1 was clearly not in accordance with the guidelines.

It is true that Mr. Forrest freely acknowledged his role in the robbery after the jury had found him guilty, and it may seem harsh to penalize him for exercising his constitutional right to a trial. But while our society places a high value on the ancient right of an accused to insist that the question of his guilt be determined by a jury of his peers, we also place a high value on governmental protection of the lives and property of people like Mohamad Tariq and Mohamad Arif and their customers. We want armed robbers taken off the street, and — rightly or wrongly — we are less than enthusiastic about shouldering the costs that would be incurred if every person accused of a crime insisted on exercising his right to a trial. The Sentencing Commission has thus decided to offer a carrot, in the form of a § 3E1.1 sentence reduction, to accused persons who plead guilty prior to trial. Some may find this decision a troubling one.[2] In construing the guidelines, however, we are obviously not at liberty to disregard the Sentencing Commission's clearly expressed policy choices.

B

The final issue presented in this appeal involves a carrot-and-stick tactic adopted by the state prosecutor in cooperation with the office of the U.S. Attorney and without the participation of the Sentencing Commission. Mr. Forrest contends — and for purposes of this opinion we accept the contention as true — that he would not have been prosecuted in federal court but for his refusal to plead guilty to the robbery charge brought against him in state court. Were he to be prosecuted federally, as the Kentucky authorities presumably told him while he was residing in their jail, he would face a mandatory sentence of at least seven years for the federal firearm offense — and that sentence would have to be served consecutively to whatever sentence might be imposed for obstruction of interstate commerce by robbery in violation of the Hobbs Act. We assume that the Kentucky authorities let Mr. Forrest know that a plea of guilty to the state robbery charge would spare him the perils of a federal prosecution and that his state sentence would probably be shorter than the sentence he could expect to receive if convicted in a federal court.

Against this background, Mr. Forrest moved for a downward departure in accordance with 18 U.S.C. § 3553(b)(1). At the time of the sentencing, § 3553(b)(1) required a sentencing court to impose a sentence within the guidelines range "unless the court finds that there exists an aggravating

---

[2]In a perfect world, no doubt, there would be no rewards for pleading guilty prior to trial and no penalties for declining to do so. But then, we suppose, in a perfect world shopkeepers would not be held up at gunpoint.

or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines . . . ."  In this connection the Sentencing Commission has explained that it "intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes.  When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted."  U.S.S.G. Ch. 1 Pt. A ¶ 4(b) (2002).

In *Booker*, the Supreme Court elected to "excise" § 3553(b)(1), at least insofar as that section "*require[d]* sentencing courts to impose a sentence within the applicable Guidelines range (in the absence of circumstances that justify a departure) . . . ."  *Booker*, 125 S.Ct. at 764.  (Emphasis supplied.)  At the same time, the *Booker* Court explained that "[w]ithout the 'mandatory' provision, the Act nonetheless requires judges to take account of the Guidelines . . . ."  *Id*.  Judges cannot "take account" of the guidelines without considering the "sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant," *id*. at 764 (quoting 18 U.S.C. § 3553(a)(4)), and we take it that judges must also consider — even though they are no longer bound by — what the guidelines say about departing from the guidelines sentencing range.

In the case at bar the district court concluded that Mr. Forrest's robbery offense fell outside the "heartland" of guideline cases because the robbery was being prosecuted in federal court rather than in state court.  Most robberies that do not involve organized crime or gang activity are prosecuted locally.  Indeed, as the district court noted, internal Department of Justice guidance contained in the 1997 United States Attorney Manual tells federal prosecutors that "[t]he robbery offense in 18 U.S.C. Sec. 1951 [the Hobbs Act] is to be utilized only in instances involving organized crime, gang activity, or wide-ranging schemes."  The district court was thus sympathetic to Mr. Forrest's argument that "this is not the typical federal robbery case."  Given what the court called "the historical use of the Hobbs Act, the types of robberies customarily prosecuted in federal court, the suggestion of punitive federal prosecution, and the nature of the offense involved in this case," and given the court's belief that Mr. Forrest's participation in the hold up was "outside the heartland of robbery cases addressed by the Sentencing Guidelines," the court decided that a substantial downward departure was warranted.

Under either a "de novo" standard or an "abuse of discretion" standard the district court's decision to depart would seem to be erroneous.[3]  "What the district court must determine is whether the *misconduct* that occurred in the particular instance suffices to make the case atypical."  *Koon v. United States*, 518 U.S. 81, 100 (1996).  (Emphasis supplied.)  The sentencing court's focus, in other words, must be on "the *conduct* that each guideline describes."  U.S.S.G. Ch. 1 Pt. A ¶ 4(b) (2002).  (Emphasis supplied.)

The guideline under which Mr. Forrest was sentenced for his Hobbs Act violation is U.S.S.G. § 2B3.1.  The conduct that § 2B3.1 "describes" is, in a word, "Robbery."  The question to be answered in the "heartland" analysis is not whether the decision to prosecute Forrest in federal court under the Hobbs Act was atypical, but whether the robbery committed by Forrest was atypical of robberies in general.

---

[3] Prior to 2003, we applied an abuse-of-discretion standard in reviewing downward departures.  See *Koon v. United States*, 518 U.S. 81, 97-100 (1996).  But under 18 U.S.C. § 3742(e), as amended by § 401(d) of the PROTECT Act, Pub.L. 108-21, 117 Stat. 650 (April 30, 2003), we were instructed to review downward departures de novo.  See *United States v. Camejo,* 333 F.3d 669, 675 (6th Cir. 2003).  Section 3742(e) has now been "excised" by *Booker*, see *id.* at 764.

The question answers itself.  With apologizes to Gertrude Stein, a robbery is a robbery is a robbery — and regardless of where it wound up being prosecuted, the robbery committed by Mr. Forrest was surely not an atypical robbery.  Had he committed that robbery on a military base and been convicted under the Assimilative Crimes Act, 18 U.S.C. § 13, Mr. Forrest would have been sentenced under § 2B3.1.  See U.S.S.G. § 2X5.1, comment. (backg'd.) ("The sentencing guidelines apply to convictions under 18 U.S.C. § 13 . . . .").  Would Forrest's conduct have been deemed atypical under that hypothesis?  We think not.  The circumstance that enables the government to proceed in federal court — whether it be that the robbery occurred on a federal reservation or that the robbery obstructed interstate commerce — is not a circumstance that bears on the typicality of the defendant's "offense conduct," to use the guidelines term.

The district court was concerned in this case about "the suggestion of punitive federal prosecution."  We fully understand the basis for the court's concern.  Again, however, the motivation of the prosecutor has no bearing, as far as we can see, on the typicality of the defendant's misconduct.  For what it may be worth, moreover, we note that just as a "decision to prosecute [the defendant] under a statute with a 'severe' penalty is not cause for a downward departure," see *United States v. Reed*, 264 F.3d 640, 650 (6th Cir. 2001), a federal indictment obtained against one who has been threatened with federal prosecution for refusing to plead guilty to state charges is not subject to dismissal on grounds of "vindictive prosecution."  See *United States v. Williams*, 47 F.3d 658, 661 (4th Cir. 1993) (citing *Bordenkircher v. Hayes*, 434 U.S. 357, 358-59, 365 (1978) (no prosecutorial vindictiveness in charging the defendant under a recidivist statute carrying a mandatory life term after the defendant has refused to plead guilty to original charges that carried a sentence of two to 10 years)).[4]

IV

For the reasons stated in the preceding part of this opinion, we believe that the district court misread the guidelines in concluding that they authorized imposition of a prison term outside a range of 33 to 41 months for Mr. Forrest's Hobbs Act violation.  Had the district court read the guidelines correctly, and had the court realized at the same time that *Booker* would render the guidelines advisory rather than mandatory, we do not know whether the court would have imposed a sentence of 12 months, 33 months, or some intermediate term.  Accordingly, Mr. Forrest must be resentenced.

On remand, the district court should take the guidelines into account, reading them as we have read them here.  The court need not follow the guidelines, however, if it concludes that a Hobbs Act sentence outside the guidelines range would be reasonable in light of the statutory factors set forth in 18 U.S.C. § 3553(a).  If the district court again elects to go outside the guidelines range, a fresh statement of the court's reasons for doing so would be helpful should the government again appeal.

Mr. Forrest's Hobbs Act sentence is **VACATED**, the judgment of conviction and sentence is in all other respects **AFFIRMED**, and the case is **REMANDED** for further proceedings not inconsistent with this opinion.

---

[4] It is worth noting also that under the Supreme Court's long-standing "dual sovereignty" doctrine (see *United States v. Lanza*, 260 U.S. 377 (1922)), the Double Jeopardy Clause of the U.S. Constitution would not have barred prosecutions of Mr. Forrest by both the federal government and the state government for his conduct at the convenience store.  It follows, in our view, that the district court's assessment of this conduct at sentencing should not depend on the charging decisions made by the two sovereigns.