# United States Court of Appeals
## For the First Circuit

No. 06-1634

UNITED STATES OF AMERICA,

Appellee,

v.

UGOCHUKWU OSSAI,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, U.S. District Judge]

Before

Boudin, Chief Circuit Judge,

Cyr and Stahl, Senior Circuit Judges.

Jonathan R. Saxe, Assistant Federal Public Defender, Federal Defender Office, for appellant.
Terry L. Ollila, Assistant United States Attorney, with whom Thomas P. Colantuono, United States Attorney, and David A. Feith, Assistant United States Attorney, were on brief for appellee.

April 24, 2007

**CYR, <u>Senior Circuit Judge</u>**.  Ugochukwu Ossai appeals from the judgment of conviction and sentence imposed by the district court pursuant to the Hobbs Act, 18 U.S.C. § 1951(a), for committing and conspiring to commit robbery.  We affirm.

**I**

**<u>BACKGROUND</u>**

On December 29, 2004, two Dunkin Donuts employees – Justin Cassidy and John Chick – were at their workplace in Bedford, New Hampshire.  At approximately 6:00 p.m., Cassidy went out to the parking lot and met defendant Ugochukwu Ossai and Ossai's girlfriend, Chanrathana Khem (also a Dunkin Donuts employee), who were parked in a Volkswagen Jetta.  Ossai told Cassidy that he planned to rob the Dunkin Donuts later that evening, showed Cassidy a gun, and asked whether Cassidy wanted to participate in the robbery.  Cassidy then returned to the store.

At around 7:15 p.m., while occupied on the telephone, Chick noticed that the side door of the store was open.  Chick looked outside and saw a Jetta parked with a female driver matching Khem's description.  When Chick returned to the store to resume his phone call, he saw a person wearing a ski mask (<u>viz.</u>, Ossai) enter through the side door, carrying a handgun.  Ossai ordered Chick to lay down on the floor.  When Chick knelt instead, Ossai placed his hand and the gun at the back of Chick's neck, and stated:  "I do not want to hurt you."  Meanwhile, Ossai had passed Cassidy a

-2-

pillowcase, into which Cassidy emptied $782 from the cash registers. Ossai fled.

When the police arrived at the store, Chick informed them that he had recognized the robber's voice, and that based on Ossai's frequent visits and phone calls to Khem while she was working at the store, he believed that Ossai was the robber. Manager April Pena, who returned to the store after the robbery, told the police that she had been so busy during the morning shift that she had forgotten to insert a new videotape into the store's surveillance system that day. Consequently the tape in the machine would have stopped recording at noontime. Manager Pena and Officer Paul Roy reviewed the tape, which bore a date and time stamp on each frame, and confirmed that the last recordings occurred shortly before noon that day. Accordingly, Pena and Officer Roy concluded that there was no videotape recording of the robbery. Although Pena thought she had given the tape to Officer Roy, Roy testified that he did not receive it.

Within an hour of the robbery, the police stopped and arrested Ossai, who was subsequently indicted on one robbery count under the Hobbs Act, 18 U.S.C. § 1951(a), and one conspiracy count.[1] The district court denied Ossai's pretrial motion to

---

[1]The Hobbs Act provides:

Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or

dismiss the indictment, which was based on the government's putative loss or destruction of the store's video surveillance tape. Following a three-day jury trial, Ossai was convicted on both counts.

At sentencing, the district court increased the base offense level by two points due to the fact that Ossai had "physically restrained" his victim, John Chick. Although 87 months was the prescribed maximum sentence within the applicable guideline sentencing range (GSR), the district court imposed a 100-month sentence, citing <u>inter alia</u>, Ossai's extensive history of violent and anti-social behavior. Ossai now appeals from the final judgment of conviction and sentence.

## II

## DISCUSSION

## A. The Missing Surveillance Tape

Ossai first challenges the disallowance of the motion to dismiss the indictment due to the alleged destruction or loss of the store surveillance tape by the government. As noted, store manager April Pena testified (i) that she had forgotten to put a

---

        attempts or conspires so to do, or commits or threatens
        physical violence to any person or property in
        furtherance of a plan or purpose to do anything in
        violation of this section shall be fined under this title
        or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a).

new twenty-four-hour tape in the store's surveillance system at noon on the day of the robbery, and upon entering the office after the robbery she immediately noticed that the orange light on the system was off (indicating that the system was not recording), and (ii) that Captain Roy and she replayed the last fifteen minutes of the tape in the machine, and determined that it contained video of the restaurant only up to noontime on December 29.

Ossai does not contend that the missing tape is exculpatory in the sense that it would establish that someone else committed the robbery. Rather, Ossai concedes that the government adduced overwhelming evidence that he committed the robbery. Instead, as he contended at trial, Ossai argues that the government could not charge him under the Hobbs Act, given that both Cassidy and Chick were complicit in the robbery, thus he employed neither "actual force [n]or threatened force" in taking the money from Chick. See United States v. Skowronski, 968 F.2d 242, 248 (2d Cir. 1992).[2] Ossai maintains that Chick, as the shift supervisor,

---

[2]The Hobbs Act defines robbery as:

[T]he unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

18 U.S.C. § 1951(b)(1) (emphasis added).

-5-

possessed a key to the locked office where the video surveillance equipment was kept, that he could have tampered with the surveillance tapes in order to conceal his and Cassidy's participation in the "inside" theft, and that the missing tape might have exhibited signs that Chick had stopped or rewound the tape in order to prevent its recordation of the activities in the store at the time of the supposed "robbery."

A defendant who asserts a due process claim based on the government's failure to preserve evidence "must show that the government, in failing to preserve the evidence, (1) acted in bad faith when it destroyed evidence, which (2) possessed an apparent exculpatory value and, which (3) is to some extent irreplaceable. Thus in missing evidence cases, the presence or absence of good or bad faith by the government will be dispositive." United States v. Femia, 9 F.3d 990, 993-94 (1st Cir. 1993) (citing California v. Trombetta, 467 U.S. 479, 488-89 (1984)); see United States v. Marshall, 109 F.3d 94, 98 (1st Cir. 1997) (noting that defendant bears the burden of proof on a Femia motion). The district court denied the Ossai motion, crediting the testimony by Pena and Captain Roy that Pena had forgotten to insert a new tape in the recorder at noon on December 29, and that they reviewed the date-and-time stamped tape after the robbery and determined that it ceased recording shortly after noon on December 29, some seven hours before the robbery.

We review conclusions of law de novo, whereas subsidiary findings of fact (e.g., whether the police acted in bad faith) are reviewed only for clear error.  See United States v. Garza, 435 F.3d 73, 75 (1st Cir.), cert. denied, 126 S. Ct. 2313 (2006).  We will determine that clear error occurred only if, after due regard for the district court's opportunity to assess witness credibility, and after reviewing the evidence as a whole, we are left with the definite and firm conviction that a mistake has been made. See United States v. Zajanckauskas, 441 F.3d 32, 37 (1st Cir. 2006).

The district court finding that the missing tape was not exculpatory is not clearly erroneous.  Pena testified that she kept fifteen numbered video tapes on hand in her office, that she normally (although not always) inserted a new twenty-four-hour tape in the recorder every noontime, and after she had used all fifteen tapes, she would record over them during the ensuing fifteen-day cycle.  As the tapes were recording, the equipment superimposed the date and time of the recording on each frame of the footage.  Pena was required by her employer to review the recorded tapes at least once a week, primarily to detect theft by employees.

As Pena, who had been advised of the robbery, was driving back to the Dunkin Donuts, she was almost certain – but not absolutely sure – that she had forgotten to change the surveillance tape that noon, because she had been extremely busy and short-staffed during the morning shift.  When she arrived at her locked

office following the robbery, the fact that the orange light on the equipment was off (<u>viz.</u>, an indication that the equipment was not recording) only served to confirm her belief that she had forgotten to change the tape, as did the fact that the tape had rewound itself to the beginning. Pena testified that when a tape reached the end of its twenty-four-hour recording period, the equipment automatically rewound the tape to the beginning. Pena and Captain Roy fast-forwarded the tape to the last fifteen minutes of the recording, reviewed this end-footage, and determined that it was a recording of the store premises at or around noontime on December 29. As concerns who had access to the locked office in her absence, Pena testified that she did not believe that Chick had a key, but she was not sure.

If we were to assume, <u>arguendo</u>, the defense theory that Chick and Ossai were coconspirators (a theory later rejected by the jury), and that Chick had both the motive and opportunity to tamper with the surveillance system, there are but three conceivable factual scenarios. First, if Pena did forget to change the tape at noon on December 29, Chick might have entered the locked office after Pena left at 4:45 p.m., checked the recorder, determined that the tape was not running (and thus would not contain any evidence that an armed robbery did not occur at 7:15 p.m. on December 29), and simply left the tape alone. In such circumstances, the tape could not have been exculpatory, since it would contain no evidence

of the Chick tampering.

Second, Ossai implies that, if Pena's recollection that she did not insert a new surveillance tape at noon was wrong, Chick would have observed the new December 29 tape in its seventh hour of recording, and either (1) stopped the tape before 7:15 p.m.; (2) rewound and erased that portion of the December 29 tape that had recorded the restaurant at the time of the alleged robbery; and/or (3) rewound the tape to the beginning in the hope that Pena would mistake it for the old December 28 tape that had stopped recording at noontime and automatically rewound. Ossai relies on Pena's concession that, after the robbery, she did not review the beginning of the tape in the machine, but only the last fifteen minutes. The defense is correct that the interruptions in the action and the date-and-time stamps would have been evidence of possible tampering, but this is precisely why it seems unlikely that Chick, not knowing ahead of time which sections of the tape the police eventually would choose to review, would have hazarded this approach.

We know for a fact, in any event, that Chick took none of these actions. Pena fast-forwarded the tape to the last fifteen minutes of the recording, reviewed this footage, and confirmed that it was a recording of the store just before or around noontime on the 29th. If, however, Chick had stopped, erased and/or rewound the December 29 tape, as posited by the defense, the last fifteen

minutes of that tape would have been a recording of a different morning shift on or about December 14, 2004, since the last time that tape had been used was some fifteen days before the robbery, and only seven hours at the beginning of the December 14 tape would have been recorded over by the time of the robbery.

Had Pena changed the tape at noon on December 29, Chick might have observed the tape in the process of recording, rewound it, and replaced it with the December 28 tape to make it appear that Pena had not changed the tape at noon. If that occurred, however, it would not be the missing tape which was exculpatory, but the December 29 tape which Chick removed from the machine, a tape that Pena likely would have recorded over at a later date without any knowledge that it contained a recording of the restaurant at 7:15 p.m. on December 29.

Given the elaborateness of the tampering theory advanced by the defense, Ossai failed not only to carry the burden to prove that the missing tape was in fact exculpatory, but that the police would have found its exculpatory value readily apparent. See Femia, 9 F.3d at 993-94; see also United States v. Colon Osorio, 360 F.3d 48, 51 (1st Cir. 2004) (noting that an appellate court may affirm a district court judgment on any ground apparent in the appellate record). Although Pena testified that she gave the tape to Captain Roy, Roy testified that he did not take it into custody, largely because his and Pena's review of the tape had convinced Roy

-10-

that it had failed to record the robbery and therefore was not relevant evidence. Roy's testimony is plausible inasmuch as law enforcement officers do not normally collect evidence they deem immaterial to the offense under investigation. Further, while the defense subsequently developed the theory that Chick was complicit in the offense, Ossai cannot demonstrate that the police lost or destroyed the tape at a time when they reasonably would have foreseen its relevance to the defense theory. To assume such prescience on the part of the police officers would necessitate that they had reason to suspect that Chick was a coconspirator in the fake robbery.

For these reasons, we agree with the district court that the tampering theory advanced by the defense is unavailing. Garza, 435 F.3d at 75.

## B.    The Sufficiency of the Evidence

Ossai next contends that the government adduced insufficient evidence on an essential element of the Hobbs Act robbery, viz., that the December 29 robbery in some way "obstruct[ed], delay[ed] or affect[ed]" interstate commerce. 18 U.S.C. § 1951(a); see supra note 1. April Pena testified on direct examination that, had Ossai not stolen the $782, she would have deposited it into the owner's bank account the next day, and the owner would have used the deposited money to run the business, which necessarily required the ordering of products manufactured

-11-

outside of New Hampshire.  On cross-examination, however, the defense inquired whether Pena would have reduced her post-December 29 purchase orders by $782 because of the robbery.  She replied that the robbery did not affect her re-orders because they depended entirely on the volume of her recent sales.

Challenges to the sufficiency of the record evidence are reviewed de novo, in the light most favorable to the jury verdict; we will affirm unless the evidence is insufficient to permit the jury rationally to find, beyond a reasonable doubt, each essential element of the charged offense.  United States v. Jimenez-Torres, 435 F.3d 3, 8 (1st Cir. 2006).

The Ossai argument falters, as it incorrectly presumes that the Pena testimony on cross-examination negated her testimony on direct.  In order to establish the "interstate nexus" element prescribed by subsection 1951(a), the government need only adduce evidence of a "realistic probability" that the robbery had some slight or minimal impact on interstate commerce.  See United States v. Brennick, 405 F.3d 96, 100 (1st Cir. 2005) (finding "nexus" evidence sufficient in light of similar testimony regarding a robbery of $522.37 from a Wal-Mart store with gross monthly sales of $8.5 million).[3]  The Pena testimony that she would have

---

[3]We decline the Ossai invitation to revisit the "minimal impact" test endorsed in Brennick.  See United States v. Malouf, 466 F.3d 21, 26 (1st Cir. 2006) (noting that, with rare exception, "newly constituted panels are bound by decisions of prior panels in the same circuit"), cert. denied, No. 06-1154, 2007 WL 555499 (U.S.

-12-

deposited the stolen funds in the business' bank accounts, which the owner customarily uses to make out-of-state purchases for the business, plainly sufficed. The Pena cross-examination testimony establishes simply that she could not trace the loss of the $782 to a reduction in any particular out-of-state purchase order that she made, or that the store owner made.[4] Subsection 1951(a)'s interstate nexus element "does not turn on such accounting niceties," however, and the government need not prove that "the precise funds stolen were certain to be used in future business purchases." United States v. Nguyen, 246 F.3d 52, 55 (1st Cir. 2001); see United States v. Jamison, 299 F.3d 114, 119 (2d Cir. 2002) (affirming Hobbs Act conviction even though the victim stated that some unspecified portion of the stolen money might not have been used for future interstate purchases); United States v. Gray, 260 F.3d 1267, 1277 (11th Cir. 2001) (noting that government need not quantify interstate "effect"), cert. denied, 536 U.S. 963 (2002). As Pena was not able to deposit the $782 in the business account, the assets of a business which customarily transacts business in interstate commerce were depleted. For purposes of 18 U.S.C. § 1951(a), it matters not that the actual effect of the

---

Mar. 26, 2007).

[4]Pena testified that the owner of this Dunkin Donuts establishment operates several other businesses, and even if the stolen money might not have affected Pena's re-ordering, there is no evidence that the robbery would not deprive the owner of money which the owner might have used for interstate ordering.

-13-

robbery may be slight or even untraceable.  See Brennick, 405 F.3d at 100.

**C.    The Reasonableness of the Sentence**

### 1.    "The Physical Restraint" Sentencing Enhancement

Ossai next contends that the district court erred in imposing a two-level sentencing enhancement for using "physical restraint" against Chick during the course of the robbery, viz., placing the gun to Chick's head to force him to kneel.  U.S.S.G. § 2B3.1(b)(4)(B) (requiring a two-level enhancement "if any person was physically restrained to facilitate commission of the offense").  Ossai argues that § 2B3.1(b)(4)(B) should be triggered only if defendant tied, bound or locked up the victim, or forced the victim to accompany him to another location to prevent the victim's escape.    Finally, Ossai maintains that the § 2B3.1(b)(4)(B) enhancement amounts to impermissible double-counting under the Sentencing Guidelines, in that the method by which he restrained Chick – using a dangerous weapon – had already triggered a four-level enhancement under U.S.S.G. § 2B3.1(b)(2).  See, e.g., United States v. Cruzado-Laureano, 440 F.3d 44, 49 (1st Cir. 2006) (reversing enhancement as double-counting, but noting that "double-counting is not automatically impermissible under the Guidelines").

A sentence imposed under the now-advisory Sentencing Guidelines is to be reviewed for "reasonableness."  United States v. Alli, 444 F.3d 34, 40 (1st Cir. 2006) (citing United States v.

-14-

Booker, 543 U.S. 220, 261 (2005)). Normally, the district court must determine the applicable GSR, assess whether other factors identified by the parties warrant a sentence above or below the GSR, consider the sentencing factors set forth in 18 U.S.C. § 3553(a), and explain its reasons for imposing the ultimate sentence. Id. Thus, a sentence which exceeds the maximum GSR may be "reasonable" in the circumstances. See, e.g., United States v. Moreland, 437 F.3d 424, 433-34 (4th Cir.), cert. denied, 126 S. Ct. 2054 (2006); United States v. Jordan, 435 F.3d 693, 698 (7th Cir.), cert. denied, 126 S. Ct. 2050 (2006). "Our emphasis . . . will be on the [district court's] provision of a reasoned explanation, a plausible outcome and – where these criteria are met – some deference to different judgments by the district judges on the scene." United States v. Jimenez-Beltre, 440 F.3d 514, 519 (1st Cir. 2006)) (en banc), cert. denied, 127 S. Ct. 928 (2007). We review the district court's legal conclusions de novo, and its findings of fact only for clear error. United States v. Robinson, 433 F.3d 31, 38 (1st Cir. 2005).

"Physically restrained" connotes "the forcible restraint of the victim such as by being tied, bound, or locked up." U.S.S.G. § 1B1.1, cmt. n.1(K); see also id. § 2B3.1, cmt. background ("The guidelines provide an enhancement for robberies where a victim was forced to accompany the defendant to another location, or was physically restrained by being tied, bound, or

locked up."). Of course, these enumerated examples of "physical restraint" are merely illustrative, rather than exhaustive. <u>See</u> <u>United States</u> v. <u>DeLuca</u>, 137 F.3d 24, 39 (1st Cir. 1998).

Ossai's argument is premised primarily on the contention that use of the gun was at most a psychological restraint on Chick, rather than a physical one, as well as being a restraint intrinsic to virtually all armed robberies. The "physical restraint" test is necessarily case-specific and fact-intensive. Not every physical contact by a defendant with a victim necessarily qualifies as a cognizable "restraint" under § 2B3.1(b)(4)(B), nor would the absence of such actual physical contact necessarily foreclose a finding of "restraint," <u>see</u> <u>United States</u> v. <u>Wallace</u>, 461 F.3d 15, 33-35 (1st Cir. 2006) (affirming § 2B3.1(b)(4)(B) enhancement where the armed defendant blocked the victim's path). We need not address Ossai's argument, however, as he utilized more than the gun to make Chick kneel. Ossai's simultaneous placement of his hand on the victim's neck and shoulder to force him into a kneeling position, especially while stating that "I do not want to hurt you," unquestionably qualifies as a "physical restraint" under any reasonable connotation of that term. <u>See</u> <u>DeLuca</u>, 137 F.3d at 39 (noting that the defendant's pushing of the victim to prevent his escape from hallway qualified as "physical restraint"). Witnesses testified that Chick is a large and powerful man. By forcing Chick onto his knees, Ossai rendered Chick more vulnerable to Ossai's

-16-

will, thereby diminishing Chick's freedom of movement and ability to resist or escape.  Further, this evidence also moots Ossai's argument that the § 2B3.1(b)(4)(B) enhancement amounted to impermissible double-counting, since the use of the gun and his hand constituted discrete actions warranting distinct enhancements. See United States v. Rucker, 178 F.3d 1369, 1373 (1st Cir. 1999) (finding no impermissible double-counting because these two enhancements serve distinct purposes).

## 2.  Factor:  Non-"Manual" Hobbs Act Prosecution

Ossai next contends that the imposition of a 100-month sentence – 13 months above the maximum Guidelines sentence – was unreasonable, given that the offense of conviction was de minimis.[5] Ossai claims that the robbery of a mere $782, on one occasion, from one store, involved no unusual or aggravating circumstances, and thus falls outside the "heartland" of the Hobbs Act robbery cases contemplated by the Sentencing Commission.  Ossai cites the United States Attorneys' Manual, which suggests that only Hobbs Act robberies which involve organized crime, gang activity, or wide-ranging schemes should be prosecuted, leaving less serious offenses to state authorities.  United States Attorneys' Manual § 9-131.040. This contention is untenable.

---

[5]Ossai concedes that the district court's decision not to grant a downward departure on this ground under 18 U.S.C. § 3553(b)(1) is not appealable.  See United States v. Grandmaison, 77 F.3d 555, 560 (1st Cir. 1996).

Neither the Congress (in the Hobbs Act) nor the Sentencing Commission (in the Guidelines) remotely suggests either that robberies involving organized crime, gang activity, or wide-ranging schemes would represent the lion's share of federal prosecutions, nor that robberies not of their ilk should be considered outside the Guidelines "heartland." Both Title 18 U.S.C. § 1951(a) and U.S.S.G. § 2B3.1 speak of "robbery" in its general sense, see supra note 2, adding only the "interstate nexus" requirement essential to conferral of federal jurisdiction. See United States v. Forrest, 402 F.3d 678, 690-91 (6th Cir. 2005) (vacating downward departure under U.S.S.G. 3553(b)(1) based on defense argument that Hobbs Act robbery involving neither organized crime nor gang activity is outside "heartland" of Guidelines cases). Further, the Guidelines contain several provisions for calibrating the relative seriousness of a Hobbs Act robbery. The "Relevant Conduct" provisions contemplate judicial consideration as to whether a Hobbs Act robbery was part of a wider-ranging scheme. See U.S.S.G. § 1B1.3. Similarly, sentences are to reflect, inter alia, a defendant's utilization of a weapon, see id. § 2B3.1(b)(2), physical restraint, see id. § 2B3.1(b)(4), and the extent of victim loss, see id. § 2B3.1(b)(7). Finally, the involvement of organized crime in a Hobbs Act offense arguably was not contemplated by the Guidelines, and in fact, could constitute a legitimate ground for upward departure. See United States v. Schweihs, 971 F.3d 1302,

-18-

1316-17 (7th Cir. 1992) (noting that the language of the Hobbs Act "does not suggest a Congressional intent to limit its application to those with organized crime ties," thus affirming the district court's upward departure to reflect the fact that the Hobbs Act extortion involved the use of organized crime).

Ossai's reliance on the U.S. Attorneys' Manual is unavailing as well, inasmuch as the Manual has an entirely different focus: namely, to provide non-binding counsel to federal prosecutors as to how best to allocate limited prosecutorial resources. The Manual states that it "may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal[,] . . . [n]or are any limitations hereby placed on otherwise lawful litigative prerogatives of the Department of Justice." United States Attorneys' Manual § 1-1-100. In larger jurisdictions, federal prosecutors might elect to conserve limited resources by confining Hobbs Act prosecutions to cases involving organized crime, gang activity, or wide-ranging schemes, whereas smaller jurisdictions, such as New Hampshire, might not face similar constraints, and might routinely prosecute cases which do not fit these three categories. There is no evidence that either Congress or the Sentencing Commission considered the import of the Manual, if any. See Forrest, 402 F.3d at 691 ("[T]he motivation of the prosecutor has no bearing, as far as we can see, on the typicality of the

defendant's misconduct.").

Accordingly, the district court's decision not to accept Ossai's argument, that the district court should impose a lower sentence because his offense was outside the Guidelines "heartland," did not render unreasonable its ultimate sentence of 100 months.

### 3. Other Sentencing Factors

Finally, Ossai contends that the district court did not properly assess the remaining sentencing factors prescribed in U.S.S.G. § 3553(a) before imposing a sentence which exceeded the maximum Guidelines sentence by 13 months.

The district court aptly noted the seriousness of the circumstances surrounding the robbery, including Ossai's use of a dangerous weapon and the physical restraint he employed against a traumatized victim, and that Ossai had a lengthy history of arrests, anti-social and violent behavior, as well as drug abuse, and resistance to earlier psychological treatment. See 18 U.S.C. § 3553(a)(1) ("the nature and circumstances of the offense and the history and characteristics of the defendant"); id. § 3553(a)(2) ("the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational

training or medical care or other correctional treatment in the most effective manner").[6]  Although Ossai further faults the district court for overemphasizing his two prior adult criminal convictions for relatively minor offenses, the district court explicitly stated that it was relying on Ossai's entire history of prior arrests, substance abuse, and anti-social behavior.

Ossai additionally asserts that the district court overemphasized the menace implicit in his statement to Chick:  "I do not want to hurt you."  The court aptly noted, however, that the quoted remark is much more threatening than, for example, "I will not hurt you," such that a victim in Chick's vulnerable position – with a gun placed against his head and a captor's hand on his shoulder – in all likelihood reasonably would infer that Ossai, in effect, was stating:  "I do not want to hurt you, but I will."  Having observed Chick's demeanor at trial, the district court credited Chick's testimony that he had suffered serious mental trauma as a result of the robbery.

Finally, were there any serious question as to whether the district court's explanation for imposing a sentence above the maximum Guidelines sentence was a reasoned one, the government's

---

[6]Additionally, the district court observed that Ossai's culpability – as sole planner and recruiter for the robbery scheme – was significantly greater than that of his girlfriend, Khem, who received a 33-month sentence.  See id. § 3553(a)(6) ("the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").  Ossai does not challenge this factor on appeal.

evidence of Ossai's behavior while incarcerated awaiting trial for the robbery removes any uncertainty. At sentencing, a corrections officer testified that he had worked at the prison for seven years processing "several hundred" prisoners a day, and that Ossai was by far the "worst inmate" he had ever seen. For example, Ossai repeatedly flooded his cell and the entire cell block with thousands of gallons of urine-contaminated water, threw food, feces and urine out of his cell, and set off the overhead sprinkler systems, causing severe damage. Eventually, after Ossai continued to escape from various physical restraints, the prison had to assign a full-time guard to watch him, at a cost exceeding $17,000.

Ossai nevertheless contends, on appeal, that such evidence of extremely violent anti-social behavior merely demonstrates his need for further psychological treatment. Given the psychological testing which showed that Ossai was resistant to psychological treatment, however, the district court reasonably concluded that more prolonged incarceration (viz., a mere 15% increase above the advisory GSR maximum) is required, both to "promote respect for the law," and "protect the public" from so prodigiously dangerous an individual. 18 U.S.C. § 3553(a)(2); see United States v. Hardy, 99 F.3d 1242, 1253 (1st Cir. 1996) (affirming a 300% upward departure to reflect defendant's "history of violent anti-social behavior").

For the foregoing reasons, therefore, the district court

decision to increase the maximum Guidelines sentence was hardly "unreasonable."

**<u>Affirmed</u>**.