**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Alvin Glenn TAYLOR, Defendant–Appellant.**

**No. 97–5795.**

United States Court of Appeals, Sixth Circuit.

Submitted Nov. 6, 1998.

Decided April 1, 1999.

Alvin Glenn Taylor, Atlanta, Georgia, pro se, William C. Anderson, Jr. (briefed), Memphis, Tennessee, for Defendant–Appellant.

Tony R. Arvin, Asst. U.S. Attorney (briefed), Memphis, Tennessee, for Plaintiff–Appellee.

Before: JONES, RYAN, and BATCHELDER, Circuit Judges.

## OPINION

BATCHELDER, Circuit Judge.

The Defendant–Appellant Alvin Taylor robbed a Texaco gas station and, after a federal jury trial, was convicted of robbery affecting interstate commerce, 18 U.S.C. § 1951, and being a felon in possession of a firearm, 18 U.S.C. §§ 922(g), 924(e). Taylor raises various issues concerning his trial and sentence, most of which center around the single question of whether he used a firearm during the robbery. He also argues that the indictment should have been dismissed because the government violated the Interstate Agreement on Detainers, 18 U.S.C. app. 2. For the reasons stated below, we AFFIRM his conviction and sentence.

## BACKGROUND

On the morning of October 9, 1995, at approximately 9:00 a.m., Berry Weatherford was outside the manager's office at the Texaco gas station where he worked. He was in the process of transferring a bag of money from the station's convenience store safe to the manager's office, which was accessible only from outside the convenience store. As he reached the office door, it suddenly swung open and the defendant, Alvin Taylor, jumped out, thrust a gun into Weatherford's midsection, and demanded the money. Weatherford dropped the bag of money, Taylor picked it up and ran. Weatherford gave the police a description of both the car in which Taylor fled the scene and the gun that Taylor had brandished in the robbery. After a high-speed chase, Taylor's car collided with a Pepsi truck and Taylor attempted to flee on foot, after pointing a gun at a pursuing officer and tossing it away when, apparently, it failed to fire. Eyewitnesses gave descriptions of the gun different from the description given by Weatherford as to size and color, but they agreed with Weatherford that the weapon was an automatic pistol. Inside Taylor's car, the police found the bag of money that had been taken from Weatherford. They also found some black tape matching the tape that had been used on the door of the Texaco manager's office. They found the gun—a .25 caliber semiautomatic pistol—lying in the street where Taylor had thrown it after pointing it at the officer chasing him. Weatherford identified Taylor as the man who had robbed him.

Taylor was indicted by a federal grand jury for robbery affecting commerce in violation of 18 U.S.C. § 1951; using and carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c); and being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g), 924(e). His motion to dismiss the Indictment for violation of the Interstate Agreement on Detainers ("IAD"), 18 U.S.C. app. 2, was denied by

the district court, and after a jury trial, Taylor was convicted on the robbery and felon in possession counts. The jury was unable to reach a verdict on the § 924(c) count, and the district court granted a mistrial on that count, which was then dismissed upon the Government's motion. The court sentenced Taylor to life imprisonment for the robbery count pursuant to the federal "three strikes" statute, 18 U.S.C. § 3559(c), and a consecutive 424 months for being a felon in possession of a firearm. Taylor filed this timely appeal.

## INTERSTATE AGREEMENT ON DETAINERS

■ The Interstate Agreement on Detainers ("IAD") includes what has come to be called the "anti-shuttling" provision. That provision requires that when an individual who has "entered upon a term of imprisonment" in one jurisdiction (the "sending state"), is removed to another jurisdiction (the "receiving state") pursuant to a detainer, he must be tried in the receiving state before being returned to the sending state; if he is not, the indictment in the receiving state "shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice." See 18 U.S.C. app. 2, § 2, art. III(d).[1]

At the time Taylor was arrested by Memphis police officers for the Texaco gas station robbery at issue in this case, he was on parole in connection with a prior Tennessee conviction. After his arrest, he was housed in the Shelby County Jail, "a holding facility for pretrial detainees." His parole was revoked following a hearing on January 12, 1996, and he remained in the Shelby County Jail awaiting transfer to a state correctional facility. He was indicted by the federal grand jury for the Texaco robbery on February 27, 1996, and

the next day federal authorities lodged a detainer against him.

On March 20, 1996, pursuant to a writ of habeas corpus ad prosequendum, a United States Marshal transported Taylor from the Shelby County Jail to federal court in Memphis for his initial appearance before a magistrate, and returned him immediately thereafter to the county jail. Between that date and April 4, 1996, when his arraignment and detention hearing were finally held, Taylor was brought to federal court four times for his detention hearing; each time Taylor requested and was granted a continuance. On April 4, 1996, Taylor pled "not guilty;" the court set a trial date and entered an order of detention pending trial; and Taylor was returned to the Shelby County Jail.

On April 18, 1996, Tennessee authorities transferred Taylor to the Mark Luttrell Reception Center, a Tennessee Department of Corrections ("T.D.O.C.") facility, to serve his parole violation sentence. U.S. Marshals then lodged a new detainer with the T.D.O.C. and on June 20, 1996, pursuant to a new writ of habeas corpus ad prosequendum, Taylor was taken before the federal district court for another hearing. After that court appearance, Taylor remained in federal custody.

Taylor contends that his "term of imprisonment" for the parole violation began when he was returned to the Shelby County Jail after he was sentenced in state court on January 12, 1996; therefore, he says, the subsequent transfers back and forth between the federal courthouse and the Shelby County Jail violated the IAD. The Government counters that his "term of imprisonment" did not begin until he was transferred from the Shelby County Jail to the T.D.O.C. facility on April 18, 1996, and the IAD was not implicated by

1. Section 9 of the IAD, however, provides that when the United States is the "receiving state," dismissal with prejudice is not necessarily required; rather, the federal court needs to consider, "among others, each of the following factors: The seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of the agreement on detainers and on the administration of justice," 18 U.S.C. app. 2, § 9(1).

the shuttling back and forth that occurred before that date.

This circuit has not explained whether "term of imprisonment" includes the time that a defendant may spend in a county jail before being placed in a state penitentiary. In *United States v. Glasgow*, 790 F.2d 446 (6th Cir.1985) (per curiam), we held that the IAD's time limits never became applicable to a defendant being held in a county jail who was sentenced to a prison term in the state prison and transferred to federal custody the next day because the "defendant never actually began serving his state term of imprisonment in a state correctional facility." *Id.* at 449. In *United States v. Roberts*, 548 F.2d 665 (6th Cir.1977), we explicitly held that a *pretrial detainee* awaiting his trial has not begun his "term of imprisonment," *see id.* at 669–71. The First Circuit has quoted a portion of the reasoning of *Roberts* and extended its holding to an instance where the defendant had been tried, convicted and sentenced, but had yet to be moved from the county jail to the state correctional facility, *see Crooker v. United States*, 814 F.2d 75, 77–78 (1st Cir.1987).

There is sharp disagreement among courts as to whether the IAD is triggered when a detainer is lodged against a convicted and sentenced prisoner who is being held in temporary custody pending a transfer to his permanent incarceration. The reasoning behind the two positions on this question is cogently summarized by the Supreme Court of North Dakota in *Runck v. State*, 497 N.W.2d 74 (N.D.1993):

> Courts which rule that a detainer lodged against a prisoner in temporary custody is of no effect and does not bring the IAD into play reason that, because the basic purpose of the IAD is to prevent interference with institutional care and rehabilitation, which is not normally available at a facility or jail designed for temporary custody of prisoners, "one cannot interrupt that which has not yet started." Courts which decline to dis-

tinguish between temporary and correctional custody in establishing the point at which the protections of the IAD become applicable reason that a rule encompassing all post-sentence confinement would be easier to apply, would avoid the possibility of encouraging the sending state to extend the period of confinement in a temporary facility because of outstanding detainers, and would alleviate judicial examination of an individual prisoner's rehabilitative status while in temporary confinement whenever an IAD claim is raised.

*Id.* at 81 (citations omitted). After reviewing the relevant cases from this circuit and those of our sister circuits and the reasoning behind the IAD, we conclude that "correctional facility" is correctly understood as meaning the state facility to which the Defendant is ultimately assigned, not the local facility in which he sits awaiting transfer to that facility. As *Runck* notes, "the basic purpose of the IAD is to prevent interference with institutional care and rehabilitation, which is not normally available at a facility or jail designed for temporary custody of prisoners," *id.* While there may be an occasional case in which a defendant awaiting transfer is involved in rehabilitative programs offered at the local facility, such rehabilitation efforts themselves ultimately would be disrupted by that defendant's transfer to his permanent correctional residence.

■ Even if we concluded that "correctional facility" includes the county jail, we would find no violation of the IAD in this case. During a 16 day period, Taylor was shuttled back and forth between the state facility and federal court a total of six times, four of which were attributable to the his own requests for continuances. Each time, Taylor was returned to the county jail the same day. Numerous circuit courts have held that such quick, temporary transfers do not violate the IAD. *See Taylor v. United States*, 504 U.S. 991, 112 S.Ct. 2982, 119 L.Ed.2d 599 (1992) (White, J., dissenting from denial of certio-

rari) (listing cases from First, Second, Fifth (Unit B 1981), Seventh, and Ninth Circuits). The position of these cases is summarized in *United States v. Daniels*, 3 F.3d 25, 27–28 (1st Cir.1993):

> Daniels's argument for dismissal is based on a literal reading of Article IV(e). Strictly speaking, the argument is not without merit. In this circuit, however, we have firmly held that "common sense rejects that literal application." Instead, we have held—as have several other circuits—that a brief interruption in state prison confinement for purposes of arraignment, where the prisoner is returned to state custody the same day, does not violate the IAD.
>
> The rationale behind our interpretation of the IAD is that a brief interruption in state custody poses no threat to the prisoner's rehabilitation efforts, the main purpose of the Act. Indeed, as we have noted, such interruptions may be advantageous to a defendant. *See, e.g.,* [*United States v.*] *Taylor,* 947 F.2d [1002,] 1003 [ (1st Cir.1991) ] (securing speedy arraignment).

(footnote and citations omitted).

This Circuit has not directly spoken on this issue.[2] We conclude that we agree with the "common sense" approach applied by a majority of the circuits rather than the strictly literal reading given the statute by a minority of the circuits, *see United States v. Thompson,* 562 F.2d 232, 234–35 (3d Cir.1977) (en banc) and *United States v. Schrum,* 504 F.Supp. 23, 28 (D.Kan.1980), *aff'd on the basis of the dist.*

ct. op., 638 F.2d 214 (10th Cir.1981). We therefore hold that Taylor's same-day transfers to and from federal court, most of which were brought about by his own requests for continuances, did not violate the IAD.

## CONCLUSION

We have considered the other claims of error made by the defendant and conclude that they do not merit discussion. Accordingly, we AFFIRM Taylor's conviction and sentence.

---

**2.** In *United States v. Eaddy,* 595 F.2d 341 (6th Cir.1979) (*"Eaddy II "*), this Court stated, "Additionally, [defendant] was shuttled back and forth between federal and State custody on two occasions after the detainer had been lodged against him, but prior to his trial on the federal bank robbery charge. Under the holding of *Mauro,* the Government's handling of Eaddy violated [Article IV(e) ]." *Id.* at 343. However, Eaddy was in Michigan State Prison, and the "two occasions" did not involve one-day trips for an initial appearance or arraignment. Rather, on the first occasion, Eaddy appeared before the district court on September 22, 1975, regarding a court-or-

dered line-up requested by Eaddy. The motion was denied, but Eaddy was retained in federal custody pending a rescheduled trial date of September 30. When the September 30 trial date was pushed back due to court congestion, he was returned to the state prison. The second occasion occurred when Eaddy was again brought to Detroit for his federal trial, this time for approximately three days, and then was returned to the state prison after the trial was again postponed, *see United States v. Eaddy,* 563 F.2d 252, 253–54 (6th Cir.1977) (*"Eaddy I "*). Thus, *Eaddy II* does not provide precedential guidance on this issue.