THE STATE OF OHIO, APPELLANT, v. BLACK, APPELLEE.

[Cite as *State v. Black*, 142 Ohio St.3d 332, 2015-Ohio-513.]

(Nos. 2013–0552 and 2013–0805—Submitted January 7, 2014—Decided February 19, 2015.)

O'CONNOR, C.J.

{¶ 1} In this appeal, we resolve a conflict between the Fifth District Court of Appeals and the Eighth District Court of Appeals over whether the term "penal or correctional institution of a party state," as used in the Interstate Agreement on Detainers, codified in R.C. 2963.30, includes a county jail.

{¶ 2} We hold that the term "penal or correctional institution of a party state," as it is used in R.C. 2963.30, includes a county jail as well as a state prison or correctional facility. Because our holding adopts the analysis of the Fifth District, we affirm.

## RELEVANT BACKGROUND

{¶ 3} The Interstate Agreement on Detainers ("IAD") is a compact among 48 states, the District of Columbia, and the United States that establishes procedures for one jurisdiction to obtain temporary custody of a prisoner incarcerated in another jurisdiction for the purpose of bringing the prisoner to trial. *Cuyler v. Adams*, 449 U.S. 433, 435, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981), fn 1. Ohio adopted the IAD in 1969 and codified its provisions in R.C. 2963.30. Am.S.B. No. 356 ("S.B. 356"), 133 Ohio Laws, Part I, 1067.

{¶ 4} The IAD arose from a report issued in 1948 that addressed difficulties that prisoners and state authorities faced regarding the use of detainers. *United States v. Mauro*, 436 U.S. 340, 349–350, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978); *see also* Meadows, *Interstate Agreement on Detainers and the Rights it Created*, 18 Akron L.Rev. 691 (1985). The Council for State Governments drafted the legislation in 1956 and included the draft with its Suggested State Legislation Programs for 1957. *Id.*; *Carchman v. Nash*, 473 U.S. 716, 719, 105 S.Ct. 3401, 87 L.Ed.2d 516 (1985). In 1970, Congress enacted the IAD into law on behalf of the United States and the District of Columbia. *Mauro* at 353. For the states, the

IAD is a congressionally sanctioned interstate compact under the Compact Clause, Article I, Section 10, of the United States Constitution. *Carchman* at 719.

{¶ 5} The term "detainer" is not defined in the IAD. When the legislation was presented to Congress, however, a "detainer" was defined as " 'a notification filed with the institution in which a prisoner is serving a sentence, advising [that he is wanted to face] pending criminal charges in another jurisdiction.' " (Bracketed material added.) Meadows, 18 Akron L.Rev. at 695, fn. 37, quoting S.Rep. No. 91–1356, at 2 (1970), reprinted in 1970 U.S.C.C.A.N. 4864, 4865.

{¶ 6} The drafters of the IAD recognized that detainers, which could be issued informally but never acted on by prosecutors, had certain detrimental effects on prisoners because they posed a threat of further prosecution and could lead to additional sanctions, higher security classification, loss of privileges, or ineligibility for rehabilitative programs and parole. *See* Meadows, 18 Akron L.Rev. at 691–692. Thus, the legislation recognized that "charges outstanding against a prisoner, detainers based on untried indictments, information or complaints, and difficulties in securing speedy trials of persons already incarcerated in other jurisdictions" cause uncertainties that "obstruct programs of prisoner treatment and rehabilitation." R.C. 2963.30, Article I.

{¶ 7} To address these uncertainties, the purpose of the IAD is twofold. Meadows, 18 Akron L.Rev. at 695. First, the IAD expressly states that its purpose is "to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations or complaints." R.C. 2963.30, Article I. Second, the IAD is intended to provide cooperative procedures to facilitate interstate transfers. *Id.* Taken together, the objective of the IAD is "to implement a defendant's right to a speedy trial and to avoid excessive interference with a prisoner's rehabilitation in the state prison system." *United States v. Palmer*, 574 F.2d 164, 167 (3d Cir.1978).

{¶ 8} The IAD outlines two procedures by which a prisoner against whom a detainer has been lodged may be transferred to the temporary custody of another state for disposition of charges pending there. "One of these procedures may be invoked by the prisoner; the other by the prosecuting attorney of the receiving State." *Cuyler*, 449 U.S. at 444, 101 S.Ct. 703, 66 L.Ed.2d 641.

{¶ 9} Under the prisoner-initiated procedure outlined in the statute, the "warden, commissioner of corrections or other officials having custody of the prisoner" must promptly inform the prisoner of any detainer as well as the prisoner's rights in making a request for final disposition. R.C. 2963.30, Article III(c). The prisoner may then provide a written notice for final disposition to the warden, commissioner of corrections, or other official having custody of him, who

must forward it to the "appropriate prosecuting official and court" in the receiving state, that is, the state where the detainer is pending. *Id.*, Article II(c) and III(b). The receiving state must bring the prisoner to trial within 180 days of receiving the prisoner's request for disposition, or the charges will be dismissed with prejudice for good cause shown. *Id.*, Article III(a) and (d). A prisoner invoking the IAD also waives any objection to extradition. *Id.*, Article III(e). Because a prisoner's request under the statute operates as a request for final disposition of any untried indictments on which a detainer from the receiving state is based, the authorities with custody of the prisoner must notify all the prosecuting officers and courts in the receiving state of any request for final disposition by the prisoner. *Id.*, Article III(d).

{¶ 10} Under the prosecutor-initiated procedure outlined in the statute, the receiving state has 120 days after the prisoner's arrival in the state to bring the prisoner to trial. *Id.*, Article IV(c). To initiate the procedure, the prosecuting official in the receiving state must make a written request for temporary custody to the "appropriate authorities of the state in which the prisoner is incarcerated," *id.*, Article IV(a), also known as the "sending state," *id.*, Article II(b). The governor of the sending state may disapprove the request sua sponte or upon the motion of the prisoner. *Id.*, Article IV(a). After the sending state receives a request, the authorities with custody over the prisoner must provide the receiving state with a certificate providing certain details regarding the prisoner's incarceration, including the time remaining to be served and any time for parole eligibility. *Id.*, Article IV(b). They must also provide notice of the request for custody to all other prosecuting authorities and courts from the receiving state who have lodged detainers against the prisoner. *Id.*, Article IV(b).

{¶ 11} Under either procedure, if a trial is not held in the receiving state "prior to the return of the prisoner to the original place of imprisonment," the charges are to be dismissed with prejudice. *Id.*, Article III(d) and IV(e). This provision is referred to as the "antishuttling provision" of the IAD. *United States v. Taylor*, 173 F.3d 538, 540 (6th Cir.1999).

{¶ 12} Resolution of this appeal requires our interpretation of the language in Article III of the IAD, which states that the statute applies to a defendant who has begun a term of imprisonment "in a penal or correctional institution of a party state." R.C. 2963.30, Article III(a). More specifically, we resolve the parties' dispute over whether "a penal or correctional institution of a party state" includes a county jail.

### PROCEDURAL HISTORY

{¶ 13} On August 2, 2010, appellee James Black was indicted in Ashland County on charges of theft and breaking and entering. A warrant was issued for his arrest. At the time, Black was being held in a county jail in Maryland

awaiting sentencing and was notified of the pending charges in Ashland County as well as of separate charges that had been filed in Richland and Franklin counties.

{¶ 14} In February 2011, Black began to serve a one-year sentence in the Cecil County Detention Center in Elkton, Maryland. Prior to beginning his sentence, Black attempted to use the prisoner-initiated procedures under the IAD to notify Ashland County of his incarceration in Maryland and his availability for disposition of the charges pending in Ashland County. But the Ashland County prosecutor notified him that his request was premature because he had not begun his term of imprisonment.

{¶ 15} In March 2011, with the assistance of the jail administrator in the Cecil County Detention Center, Black again initiated IAD requests for final disposition of his charges in Ashland, Richland, and Franklin Counties. In April 2011, the Richland County prosecutor's office responded to Black's request and prepared to transfer Black from Maryland to resolve charges of receiving stolen property, forgery, and tampering with evidence in that county.

{¶ 16} On May 27, 2011, Black was transported from Maryland to Richland County, Ohio, for disposition of the charges pending there. On July 8, 2011, while awaiting final disposition of the Richland County charges, Black was transferred to Ashland County for arraignment.

{¶ 17} Black pleaded not guilty, and the Ashland County Common Pleas Court scheduled trial for October 11, 2011, with no objection from Black or his counsel. The judge initially ordered that Black be held in the Ashland County jail until trial, but the court modified the order to temporarily return Black to Richland County because he was scheduled to be sentenced there and because his legal papers and medical provisions were there.

{¶ 18} Black was returned to Richland County where, after pleading guilty to a felony charge of tampering with evidence, he was sentenced to three years of community control. On August 1, 2011, without explanation, and before the trial was held in Ashland County, Black was sent from Ohio back to incarceration in Maryland.

{¶ 19} On August 22, 2011, Black moved to dismiss the Ashland County case. He asserted that the state had violated his speedy-trial rights by failing to prosecute him within the time required by the IAD under R.C. 2963.30. The trial court denied the motion.

{¶ 20} Black testified that he made multiple requests of the Ashland County prosecutor regarding the charges pending there, including requests that he be permitted to plea in absentia and to receive a sentence that would run concurrently with his Maryland incarceration. Black testified that he was ineligible for

parole in Maryland and that he was denied participation in a drug-rehabilitation program and a community program because of the unresolved charges in Ashland County.

{¶ 21} According to Black, his Maryland sentence ended on September 11, 2011. But Black refused to be extradited to Ohio. He remained incarcerated in Maryland until December 2011 when a Maryland judge allowed him to post bond for his release.

{¶ 22} On October 6, 2011, the Ashland County Common Pleas Court, stating that it had received notice that Black was still incarcerated in Maryland and scheduled to be released in December, sua sponte ordered that the October trial date be continued to December 6, 2011. The court noted in its judgment entry that "[d]efendant has indicated to defense counsel that he will not voluntarily return to the State of Ohio upon his release from incarceration."

{¶ 23} Black eventually returned to Ohio on his own after posting bond in Maryland. He was arrested in Medina County, where he also had an outstanding misdemeanor charge.

{¶ 24} In January 2012, the state offered Black an opportunity to plead guilty to the three counts pending in the original 2010 indictment in Ashland County and notified Black that if he did not, the state would re-indict Black on additional felony burglary and perjury counts. Black did not change his plea and on January 26, 2012, he was re-indicted on two counts of theft, one count of breaking and entering, and one count of burglary. The new indictment was assigned a new case number, case No. 12–CRI–010, and the court ultimately dismissed the case proceeding under the original indictment, case No. 10–CRI–080.

{¶ 25} On February 3, 2012, a hearing was held on Black's motion to dismiss the new indictment in which he argued that his speedy-trial rights were violated because the applicable time limits under the IAD were exceeded without resolution of the charges in Ashland County. On February 14, 2012, the trial court overruled Black's motion to dismiss. The court concluded that the IAD did not apply, because Black, while in Maryland, was incarcerated in county jail and not in a state penal or correctional institution.

{¶ 26} The Ashland County case proceeded to trial and Black was ultimately convicted of two misdemeanor counts of theft and one felony count of breaking and entering. He was sentenced to a term of 12 months in prison.

{¶ 27} The Fifth District Court of Appeals reversed the trial court's decision, holding that the trial court had erred in overruling Black's motion to dismiss. The appellate court held that the IAD did not distinguish between terms of imprisonment in county jails or state prisons and that it therefore applied to Black even though he was incarcerated in a county facility in Maryland. 2013-

Ohio-976, 989 N.E.2d 151, ¶ 27 (5th Dist.). The appellate court also recognized that the Eighth District Court of Appeals came to an opposite conclusion in *State v. Wyer*, 8th Dist. Cuyahoga No. 82962, 2003-Ohio-6926, 2003 WL 22976573. *Id.* at ¶ 23.

{¶ 28} In *Wyer*, the Eighth District held that an out-of-state county jail in which the defendant was serving a term of imprisonment was not a "penal or correctional institution of a party state" under the IAD, and therefore, the time limits under the IAD did not apply to a prisoner in a county jail. *Wyer* at ¶ 15.

{¶ 29} The Fifth District certified that its decision was in conflict with *Wyer*. We determined that a conflict exists and accepted the state's discretionary appeal on the same question as the certified conflict: whether the term "penal or correctional institution of a party state," as used in R.C. 2963.30, includes a county jail. 135 Ohio St.3d 1469, 2013-Ohio-2512, 989 N.E.2d 69. We consolidated the actions because they present the same legal question. 135 Ohio St.3d 1469, 2013-Ohio-2512, 989 N.E.2d 70.

{¶ 30} For the reasons below, we agree with the Fifth District's analysis and hold that the term "penal or correctional institution of a party state," as it is used in R.C. 2963.30, includes a county jail as well as a state prison or correctional facility.

## THE CERTIFIED—CONFLICT CASES

### *The Eighth District Opinion:* Wyer

{¶ 31} In *Wyer*, the defendant was sentenced to 12 months' imprisonment in a county jail in California. 2003-Ohio-6926, 2003 WL 22976573, at ¶ 5, 13. At the same time, charges were pending against him in Cuyahoga County. *Id.* at ¶ 5. The defendant was returned to Cuyahoga County for resolution of the charges there, but he moved to dismiss the case under the IAD for failure to commence trial within 180 days. *Id.* at ¶ 8. The trial court denied the motion to dismiss and concluded that for the IAD time limits to apply, the defendant must be incarcerated in a state penal or correctional institution. *Id.* at ¶ 12. The trial court reasoned that " '[i]f the legislative intent were to include both types of incarceration (i.e., local and state), the statute would have so read.' " *Id.*, quoting the trial court. The Eighth District agreed and concluded that a county jail was not a correctional institution for purposes of the IAD because "[t]he legislature chose not to include language encompassing all correctional facilities, rather selecting only institutions of a 'party state.' " *Id.* at ¶ 15.

{¶ 32} Other jurisdictions have also held that the IAD does not apply to prisoners in county jails. *See, e.g., State v. Breen*, 126 Idaho 305, 882 P.2d 472 (App.1994) (holding that the IAD did not apply to an inmate held in a local jail while serving an existing sentence following parole revocation and before sentenc-

ing on new charges); *State v. Wade,* 105 Nev. 206, 772 P.2d 1291 (1989) (holding that applying the IAD to inmates in county jails would frustrate the rehabilitative purposes of the IAD); *Dorsey v. State,* 490 N.E.2d 260 (Ind.1986), *overruled on other grounds, Wright v. State,* 658 N.E.2d 563 (Ind.1995) (holding that a defendant in a county jail could not invoke the IAD, because the statute was intended to benefit those in state prison).

### *The Fifth District Opinion:* Black

{¶ 33} In the decision at issue in this appeal, the Fifth District concluded that *Wyer* was not persuasive. 2013-Ohio-976, 989 N.E.2d 151, at ¶ 23. It instead looked to decisions from other jurisdictions, primarily a decision from an Arizona appellate court in *Escalanti v. Maricopa Cty. Superior Ct.,* 165 Ariz. 385, 799 P.2d 5 (App.1990). 2013-Ohio-976, 989 N.E.2d 151, at ¶ 27.

{¶ 34} In *Escalanti,* the Arizona court held that the clear and unambiguous language of the IAD is applicable to inmates in county jails. *Escalanti* at 388. The court relied on definitions of "penal institution" and "correctional institution" in the Fifth Edition of Black's Law Dictionary that did not distinguish between jails and prisons. *Id.* at 387. Agreeing with the rationale in *Escalanti,* the Fifth District concluded that the IAD "applies to offenders held in county jails as well as state penal or correctional facilities." 2013-Ohio-976, 989 N.E.2d 151, at ¶ 27.

{¶ 35} In addition to an Arizona appellate court and our Fifth District Court of Appeals, other jurisdictions have also held that the IAD applies to inmates in both county jails and state prisons. *See, e.g., People v. Walton,* 167 P.3d 163 (Colo.App.2007) (holding that applying the IAD to inmates in county jails is consistent with the purposes of the IAD); *State v. Lock,* 839 S.W.2d 436 (Tenn.Crim.App.1992) (holding that the physical location of the prisoner should not control the application of the IAD so long as the prisoner is serving a term of imprisonment); *Felix v. United States,* 508 A.2d 101 (D.C.App.1986) (holding that the relevant inquiry is whether the prisoner has begun serving his term of imprisonment regardless of the type of correctional facility).

### ANALYSIS

{¶ 36} We are persuaded by the Fifth District and the Arizona court's reasoning in *Escalanti.* Thus, we reject the Eighth District's interpretation of R.C. 2963.30.

{¶ 37} Our role in cases of statutory construction is to determine legislative intent by looking to the language of the statute and the purpose to be accomplished by the statute. *Boley v. Goodyear Tire & Rubber Co.,* 125 Ohio St.3d 510, 2010-Ohio-2550, 929 N.E.2d 448, ¶ 20. When the statute's meaning is clear and unambiguous, we apply the statute as written. *Id.*

{¶ 38} A statute is ambiguous when it is reasonably susceptible to more than one meaning. *State v. Jordan,* 89 Ohio St.3d 488, 492, 733 N.E.2d 601 (2000). If a statute is ambiguous, "courts seek to interpret the statutory provision in a manner that most readily furthers the legislative purpose as reflected in the wording used in the legislation." *State ex rel. Toledo Edison Co. v. Clyde,* 76 Ohio St.3d 508, 513, 668 N.E.2d 498 (1996). To determine the General Assembly's intent, the court may consider several factors, including the object sought to be obtained, the legislative history, and the consequences of a particular construction. R.C. 1.49.

{¶ 39} Neither the IAD nor any provision of the Revised Code define "penal institution" or "correctional institution." In the absence of a definition of a word or phrase used in a statute, words are to be given their common, ordinary, and accepted meaning. *Wachendorf v. Shaver,* 149 Ohio St. 231, 78 N.E.2d 370 (1948), paragraph five of the syllabus.

{¶ 40} The current edition of *Black's Law Dictionary* does not define the terms "correctional institution" or "penal institution," but instead refers readers searching for these definitions to the term "prison." *Black's Law Dictionary* 420, 1313 (10th Ed.2014). A common but restricted definition of "prison" is as a "state or federal facility of confinement for convicted criminals, esp. felons." *Id.* at 1387. In contrast, "jail" is defined as "[a] prison; esp. a local government's detention center where persons awaiting trial or those convicted of misdemeanors are confined." *Id.* at 962.

{¶ 41} The Ohio General Assembly has defined "prison" for purposes of R.C. Chapter 2929, which governs penalties and sentencing, as "a residential facility used for the confinement of convicted felony offenders that is under the control of the department of rehabilitation and correction." R.C. 2929.01(AA). In contrast, a "jail" is defined as a facility used to confine alleged or convicted offenders that is operated by a political subdivision of the state, such as a county or municipality. R.C. 2929.01(R). Pursuant to R.C. 5120.10, the state director of rehabilitation and correction promulgates minimum standards for jails and the division of parole and community services investigates jails for compliance with the standards. But operation of the jails is left to the counties. R.C. 2929.01(R).

{¶ 42} Thus there is no question that in Ohio, prisons and jails are distinct. Prisons are state-run facilities and jails are operated by counties. But the IAD did not use the terms "prison" and "jail." The critical question of whether a county jail is a "penal or correctional institution of the state" requires further analysis.

{¶ 43} Relying on the Fifth Edition of *Black's Law Dictionary, Escalanti* held:

> A "penal institution" is a "generic term to describe all places of confinement for those convicted of crime such as jails, prisons, and houses of correction." Black's Law Dictionary 1020 (5th ed. 1979). A "correctional institution" is a "generic term describing prisons, jails, reformatories and other places of correction and detention." *Id.* at 311.

165 Ariz. at 387, 799 P.2d 5.

{¶ 44} But the Fifth Edition of *Black's* was not published until 1979, after the IAD was drafted. And earlier versions of *Black's Law Dictionary*, including the version that was effective when the IAD was adopted by Congress and in Ohio, do not contain definitions of "penal institution" or "correctional institution." *See Black's Law Dictionary* (4th Rev.Ed.1968) and (3d Ed.1933).

{¶ 45} Because the term "penal or correctional institution" is not defined in the statute and because there is little guidance available regarding the common, ordinary, and accepted meaning of the term, it is reasonably susceptible to more than one interpretation, as demonstrated by the split of jurisdictions on this issue. Thus, we find that the meaning of "penal or correctional institution," as used in the IAD, is ambiguous. Accordingly, we look to other sources to determine the meaning of the phrase in the statute.

{¶ 46} The United States Supreme Court has held that interpretation of the IAD is a question of federal law subject to federal construction because the statute is a congressionally sanctioned interstate compact. *Carchman,* 473 U.S. at 719, 105 S.Ct. 3401, 87 L.Ed.2d 516; *Cuyler,* 449 U.S. at 438–442, 101 S.Ct. 703, 66 L.Ed.2d 641.

{¶ 47} Federal courts have uniformly held that the IAD applies only to prisoners who have begun serving their sentence of imprisonment and not to detainees who are awaiting the disposition of their proceedings because, in part, pretrial detainees do not yet have an interest in rehabilitation programs. *See, e.g., United States v. Dobson,* 585 F.2d 55, 59 (3d Cir.1978) (noting that various federal and state courts have declined to extend the IAD to pretrial detainees); *United States v. Roberts,* 548 F.2d 665, 671 (6th Cir.1977) (holding that the IAD did not apply to a pretrial detainee who had not yet begun his term of imprisonment). Courts are split, however, regarding whether the IAD applies to prisoners who have been sentenced but remain in temporary custody awaiting transfer to the facility where they will serve their sentence. *See, e.g., United States v. Taylor,* 173 F.3d 538, 541 (6th Cir.1999) (holding that the IAD was not triggered after sentencing until the prisoner was transferred to the state facility in which he would be serving his sentence); *Runck v. State,* 497 N.W.2d 74, 81 (N.D.1993) (noting a split among jurisdictions whether the IAD applies to a prisoner remaining in temporary custody after sentencing); *compare State v.*

*Springer*, 406 S.W.3d 526, 538 (Tenn.2013) (holding that a term of imprisonment under the IAD "begins when a prisoner is sentenced and confined" regardless of the nature of the facility in which he or she is located when invoking the IAD).

{¶ 48} Few federal cases have addressed whether a jail is a "penal or correctional institution" for purposes of the IAD, and none are directly on point here. *See Walton*, 167 P.3d at 166 ("We have found no federal case addressing specifically whether a jail is a 'penal or correctional institution' under the IAD when it is the facility to which a defendant is ordered to serve his or her sentence"). *See also United States v. Evans*, W.D.Va. No. 1:08cr00024–006, 2008 WL 3834089, *3, 2008 U.S. Dist. LEXIS 63292, 10 (Aug. 15, 2008) (relying on the definition of "local correctional facility" in Virginia's statutory code to determine the meaning of "penal or correctional institution," because it was undefined in the IAD).

{¶ 49} Ohio appellate courts, including the Fifth District, have held that under Ohio's speedy-trial statute, R.C. 2941.401, a jail is not a "correctional institution of this state."[1] *See State v. Charity*, 7th Dist. Mahoning No. 12 MA 214, 2013-Ohio-5385, 2013 WL 6499452, ¶ 21 (holding that "[a] county jail is not a 'correctional institution of this state' " for purposes of R.C. 2941.401); *State v. Barr*, 11th Dist. Portage No. 2008–P–0031, 2009-Ohio-1146, 2009 WL 653803, ¶ 37–38 (holding that R.C. 2941.401 does not apply to a prisoner in a county jail and that a county jail is not a correctional institution under the statute); *State v. Siniard*, 6th Dist. Huron No. H–03–008, 2004-Ohio-1043, 2004 WL 413328, ¶ 9 (holding that R.C. 2941.401 does not apply to an accused held in county jail rather than a state prison); *Newark v. Barcus*, 5th Dist. Licking No. 94 CA 00015, 1994 WL 590498, *2 (Sept. 29, 1994) (holding that R.C. 2941.401 applies only to prisoners in a state facility and not to those in a county jail).

{¶ 50} We might find our appellate courts' interpretation of the language in R.C. 2941.401 instructive to the interpretation of similar language in the IAD if the IAD governed procedures for inmates housed only in Ohio. But the IAD also applies to those imprisoned *outside* Ohio seeking to dispose of charges pending here. Thus, Ohio's correctional system is not the governing consideration and

---

1. R.C. 2941.401 is one of the statutes governing Ohio's speedy-trial rules; it applies when a defendant located in a "correctional institution" in Ohio seeks to resolve charges pending elsewhere in the state. *See State v. Charity*, 7th Dist. Mahoning No. 12 MA 214, 2013-Ohio-5385, 2013 WL 6499452, ¶ 10. R.C. 2941.401 and 2963.30, both enacted in 1969, were intended as "companion" bills. *See* Am.S.B. No. 355 ("S.B. 355"), 136 Ohio Laws, Part I, 1065, and Am.Sub.S.B. No. 356 ("S.B. 356"), 136 Ohio Laws, Part I, at 1067; Am.S.B. No. 355, Bill Analysis (noting that S.B. 355, which is codified at R.C. 2942.401, was enacted as a "companion to S.B. 356," that is, the IAD, which is codified at R.C. 2963.30); *see also* Katz, Giannelli, Lipton, and Crocker, 2 Baldwin's Ohio Practice Criminal Law, Section 59:12, at 392 (3d Ed.2009) ("R.C. 2963.30 complements R.C. 2941.401 * * *").

interpretation of the IAD consistent with Ohio's speedy-trial statute is neither helpful nor practical.

{¶ 51} To demonstrate this point, if application of the IAD were limited to prisoners in state prisons and did not apply to those incarcerated in county jails, Ohio prosecutors who received requests from out-of-state prisoners for disposition of charges under the IAD would not be able to take advantage of Ohio's settled distinction between jails and prisons. Instead, the prosecutor would have to inquire whether the out-of-state prisoner is housed in a jail or prison or some type of facility covered by the IAD and also whether that state applies the IAD to inmates in jails. Such a result does not further the purpose of the IAD to facilitate state-to-state transfers to expedite disposition of detainers. "Because the IAD is a uniform act, officials who receive IAD disposition requests from out-of-state inmates should not be required to research or guess whether the other state treats its jails as 'penal or correctional institutions.'" *Walton*, 167 P.3d at 166.

{¶ 52} We find the reasoning of the court of appeals' decision in this case and those decisions with holdings similar to it to be persuasive. For example, in *Escalanti*, the Arizona court found no language in the IAD expressly limiting its application to state-run facilities and therefore concluded that for the purposes of the IAD, there is no difference between a county jail and a state prison except the "sign on the building." 165 Ariz. at 387, 799 P.2d 5. In *Springer*, the Supreme Court of Tennessee noted that a sentence in Tennessee could be served in a county jail or a state prison, and therefore, applying the IAD to any prisoner serving his or her sentence regardless of location "provides a consistent bright line rule for courts to follow, and it effectuates the intent of the legislature in adopting the IAD." 406 S.W.3d at 538.

{¶ 53} The Sixth Circuit noted that rehabilitative programs are "'not normally available at a facility or jail designed for temporary custody of prisoners.'" *Taylor*, 173 F.3d at 541, quoting *Runck v. State*, 497 N.W.2d 74, 81 (N.D.1993). But this differs from state to state. Thus, relying on the nature of the facility and whether it offers rehabilitative programs to limit the meaning of the statutory language is not useful. In fact, the unsuitability of relying on the nature of the facility has led to the "widely accepted view that a prisoner's operative rights under the Act arise once the prisoner begins serving a term of imprisonment." *Felix v. United States*, 508 A.2d 101, 106 (D.C.App.1986).

> Different jurisdictions maintain various types of correctional institutions and different administrative procedures for both incarcerating a prisoner and instituting that prisoner's rehabilitation program. Uncertainty would be created if every time an IAD claim was raised [a] court was required to

examine an individual prisoner's rehabilitative status within a particular state correctional system.

*Id.*

{¶ 54} The IAD specifically mandates that the "agreement shall be liberally construed so as to effectuate its purposes." R.C. 2963.30, Article IX. The dual purposes of the statute—expeditious and orderly disposition of detainers filed in other jurisdictions and cooperative procedures for inmate transfers—are best furthered by a broad application of the IAD to any prisoner serving his or her sentence regardless of the facility in which that sentence is being served. Accordingly, we conclude that the term "penal or correctional institution of a party state" in R.C. 2963.30 can encompass a county jail as well as a state prison or correctional facility so long as the prisoner has begun serving his or her sentence.

{¶ 55} We recognize that although many states share our analysis, other states apply the IAD to inmates only in state facilities and not in county jails. However, any lack of uniformity with other states resulting from our decision is not an issue that this court can resolve. And, our holding, of course, is limited in precedential effect only to Ohio courts.[2]

{¶ 56} The uniformity we accomplish here is to resolve the conflict between our appellate courts by interpreting the intent of the General Assembly in enacting the IAD with the purpose of providing guidance to state authorities and any defendant with charges pending here. In the absence of uniform federal guidance on the present issue, we must interpret the language of R.C. 2963.30 to effectuate the intent of the General Assembly in adopting the IAD.

## CONCLUSION

{¶ 57} We agree that the better-reasoned approach is that taken by the Fifth District Court of Appeals. We therefore answer the certified question as follows: the term "penal or correctional institution of a party state," as used in R.C. 2963.30, includes a county jail as well as a state prison or correctional facility. Accordingly, we affirm the Fifth District Court of Appeals' judgment.

Judgment affirmed.

PFEIFER, LANZINGER, FRENCH, and O'NEILL, JJ., concur.

O'DONNELL and KENNEDY, JJ., dissent.

---

2. Our holding is also limited to transfers under the IAD, and therefore, does not affect speedy-trial rights conferred by other statutes or the state or federal Constitution.

O'Donnell, J., dissenting.

{¶ 58} Respectfully, I dissent.

{¶ 59} At issue in this case is whether the term "penal or correctional institution of a party state" in R.C. 2963.30—Ohio's codification of the Interstate Agreement on Detainers ("IAD")—includes county jails. Unlike the majority, I do not believe that this term includes county jails. The plain language of the IAD, as codified in the statute, establishes that the term "penal or correctional institution of a party state" refers to a state penal or correctional institution.

## Facts and Procedural History

{¶ 60} On August 2, 2010, in case No. 10–CRI–080, Ashland County issued an indictment charging James D. Black with theft and breaking and entering, and it issued a warrant for his arrest. At the time of this indictment, Maryland authorities held Black in a county jail where he awaited sentencing for other crimes.

{¶ 61} On January 27, 2011, Black submitted a notice of availability to the Ashland County trial court and provided a copy of the notice to the Ashland County prosecutor. The prosecutor responded, suggesting that the notice of availability was premature because Black had not been serving any sentence and had not been incarcerated in a state penal institution.

{¶ 62} In February 2011, Black began serving a one-year sentence in a county detention center in Maryland. The following month, with the assistance of the administrator of the detention center, Black took steps pursuant to R.C. 2963.30 to dispose of the Ashland County charges and other charges filed against him in Richland and Franklin Counties.

{¶ 63} In April 2011, the Richland County prosecutor's office arranged to transfer Black from Maryland to resolve charges in that county. The next month, Maryland authorities sent Black to Richland County.

{¶ 64} On July 8, 2011, Richland County deputy sheriffs brought Black to Ashland County for arraignment. At the arraignment hearing, with the agreement of the parties, the Ashland County trial court set a trial date for October 11, 2011. It ordered that Black "remain in the custody of the Ashland County Jail during the pendency of this matter, unless otherwise removed pursuant to warrant for Richland County's purposes," but later modified this order to temporarily return Black to Richland County. After the arraignment hearing, Richland County deputy sheriffs brought Black to Richland County, where on July 19, 2011, pursuant to a guilty plea, a trial court convicted him of felony tampering with evidence. At some point, the state also resolved the Franklin County charges against him.

{¶ 65} On August 1, 2011, Richland County authorities sent Black to Maryland. Three weeks after his return to Maryland—on August 22, 2011—Black moved to dismiss the Ashland County case, asserting a violation of his speedy-trial rights due to a failure to prosecute him in accordance with R.C. 2963.30. The trial court denied this motion.

{¶ 66} According to Black, his Maryland sentence ended on September 11, 2011, he refused extradition to Ohio, and he remained in a Maryland county detention center until December 2011, when a Maryland judge permitted him to post bond for his release. On December 6, 2011, the Ashland County trial court stated that Black had appeared before it. However, on December 30, 2011, he failed to appear at another pretrial hearing. At that hearing, when the trial court inquired about Black's whereabouts, his counsel stated:

> I don't know. My last conversation with Mr. Black, he was still in Maryland, and I believe due to his anger over the Motion to Dismiss not being granted, he stated, as I related to the Court, he will not come back voluntarily for this trial * * *.

The trial court issued an arrest warrant. Black later represented to the trial court that on December 12, 2011, he had been arrested in Medina County on an outstanding misdemeanor charge and held in that county until his transfer to Ashland County.

{¶ 67} In January 2012, the state offered a plea agreement to Black, informing him that if he did not accept the agreement, it intended to re-indict him on additional charges. Black refused the state's offer and refiled his August 22, 2011 motion to dismiss as an amended motion to dismiss, which the trial court denied.

{¶ 68} On January 26, 2012, in Ashland County Court of Common Pleas case No. 12–CRI–010, an Ashland County grand jury indicted Black, charging him with two counts of felony theft, one count of felony breaking and entering, and one count of felony burglary. On February 3, 2012, Black moved to dismiss, arguing that the state had failed to prosecute him within the time required by R.C. 2963.30. After holding a hearing, the trial court denied his motion, holding that R.C. 2963.30 did not apply, because Black was incarcerated in an out-of-state county detention facility instead of a state penal or correctional institution. It also dismissed case No. 10–CRI–80.

{¶ 69} The state again amended the indictment, charging Black with two counts of misdemeanor theft and one count of felony burglary. The matter proceeded to trial, and a jury found Black guilty of the misdemeanor theft charges and one felony count of breaking and entering as a lesser included

offense of burglary. The trial court convicted him and imposed an aggregate 12–month prison term.

{¶ 70} Black appealed to the Fifth District Court of Appeals, arguing that he had been tried in violation of R.C. 2963.30. 2013-Ohio-976, 989 N.E.2d 151, ¶ 12 (5th Dist.). The court of appeals reversed the trial court's judgment, holding that R.C. 2963.30 applied to offenders held in county jails as well as in state penal or correctional facilities. *Id.* at ¶ 27, 29.

{¶ 71} The state appealed to this court and presented a judgment from the Fifth District Court of Appeals that certified that its decision in *Black* conflicted with a decision in *State v. Wyer,* 8th Dist. Cuyahoga No. 82962, 2003-Ohio-6926, 2003 WL 22976573. We determined that a conflict existed, accepted the state's discretionary appeal, sua sponte consolidated the cases, and ordered the parties to brief this issue: "Whether the term 'penal or correctional institution of a party state' as used in R.C. 2963.30, includes county jails." 135 Ohio St.3d 1469, 2013-Ohio-2512, 989 N.E.2d 69 and 70.

## Law and Analysis

{¶ 72} The IAD "is a compact among 48 states, the District of Columbia, Puerto Rico, the Virgin Islands, and the United States." *Carchman v. Nash,* 473 U.S. 716, 719, 105 S.Ct. 3401, 87 L.Ed.2d 516 (1985). "As 'a congressionally sanctioned interstate compact' within the Compact Clause of the United States Constitution, * * * the IAD is a federal law subject to federal construction." *New York v. Hill,* 528 U.S. 110, 111, 120 S.Ct. 659, 145 L.Ed.2d 560 (2000), citing *Carchman* at 719; *Cuyler v. Adams,* 449 U.S. 433, 442, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981). When the United States Supreme Court has not ruled on a particular question regarding the IAD, a state court may interpret the IAD's availability and application. *See State v. Welker,* 157 Wash.2d 557, 564, 141 P.3d 8 (2006).

{¶ 73} In 1969, Ohio adopted the IAD—which consists of nine Articles—codifying it in R.C. 2963.30. Am.S.B. No. 356, 133 Ohio Laws, Part I, 1067. Article I sets forth the purpose of the agreement, stating:

> The party states find that charges outstanding against a prisoner, detainers based on untried indictments, informations or complaints, and difficulties in securing speedy trials of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation. Accordingly, it is the policy of the party states and the purpose of this agreement to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments,

informations or complaints. The party states also find that proceedings with reference to such charges and detainers, when emanating from another jurisdiction, cannot properly be had in the absence of cooperative procedures. It is the further purpose of this agreement to provide such cooperative procedures.

{¶ 74} Article III establishes a prisoner-initiated procedure in which a prisoner against whom a detainer has been lodged may be transferred to the custody of a receiving state. R.C. 2963.30, Article III; *Cuyler* at 444. *Compare* R.C. 2963.30, Article IV (establishing procedure by which a prosecutor in a receiving state may initiate a transfer). In *Cuyler,* the United States Supreme Court stated that Article III of the IAD

> requires the warden to notify the prisoner of all outstanding detainers and then to inform him of his right to request final disposition of the criminal charges underlying those detainers. If the prisoner initiates the transfer by demanding disposition (which under the Agreement automatically extends to *all* pending charges in the receiving State), the authorities in the receiving State must bring him to trial within 180 days or the charges will be dismissed with prejudice, absent good cause shown.

(Emphasis sic.) *Id.* at 444.

{¶ 75} Notably, the term "penal or correctional institution of a party state"— the term at issue here—occurs only in Article III(a) of R.C. 2963.30. Article III(a) states:

> Whenever a person has entered upon a term of imprisonment in a *penal or correctional institution of a party state,* and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint: provided that for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance.

(Emphasis added.)

{¶ 76} The meaning of the term "penal or correctional institution of a party state" in Article III(a) presents a question of statutory construction and interpretation. In *State v. Hairston*, 101 Ohio St.3d 308, 2004-Ohio-969, 804 N.E.2d 471, ¶ 11–12, we stated:

> "The object of judicial investigation in the construction of a statute is to ascertain and give effect to the intent of the law-making body which enacted it." *Slingluff v. Weaver* (1902), 66 Ohio St. 621, 64 N.E. 574, paragraph one of the syllabus. This court may engage in statutory interpretation when the statute under review is ambiguous. Id.
>
> "But the intent of the law-makers is to be sought first of all in the language employed, and if the words be free from ambiguity and doubt, and express plainly, clearly and distinctly, the sense of the law-making body, there is no occasion to resort to other means of interpretation. The question is not what did the general assembly intend to enact, but what is the meaning of that which it did enact. That body should be held to mean what it has plainly expressed, and hence no room is left for construction." Id. at paragraph two of the syllabus.

{¶ 77} In Article III(a), R.C. 2963.30, the General Assembly used the prepositional phrase "of a party state" to modify "penal or correctional institution," thereby indicating that the penal or correctional institution belongs to, relates to, or is connected with the state. A plain reading of Ohio's version of Article III(a) shows that a penal or correctional facility of a political subdivision is not included within its scope.

{¶ 78} If the General Assembly intended for a penal or correctional facility of a political subdivision to be included within the scope of Article III(a), it could have used language to show this intent. It did not. *Compare* Md.Code Ann., Corr.Servs., 8–401(d) (definitional section of Maryland's version of the IAD) (" 'Correctional institution' means, with reference to the correctional institutions of this State, any State or local correctional facility").

{¶ 79} Neither did the legislature include language in R.C. 2963.30, Article II—a definitional article—indicating that the term "state" includes a political subdivision of a state. Article II of R.C. 2963.30 provides: "As used in this agreement: (a) 'State' shall mean a state of the United States[;] the United States of America[;] a territory or possession of the United States[;] the District of Columbia[;] the Commonwealth of Puerto Rico."

{¶ 80} Among the purposes of the IAD is the avoidance of disruptions to prisoner treatment and rehabilitation. *See* R.C. 2963.30, Article I. Generally speaking, in Ohio, prisoner treatment and rehabilitation occur in state correctional institutions. For example, pursuant to R.C. 5120.032(A), the Ohio Department of Rehabilitation and Correction ("ODRC") is authorized to develop and implement "intensive program prisons" that "focus on educational achievement, vocational training, alcohol and other drug abuse treatment, community service and conservation work, and other intensive regimens or combinations of intensive regimens." And in R.C. 5120.033, the General Assembly authorized the ODRC to develop and implement intensive program prisons for certain offenders of statutes prohibiting the operating of a motor vehicle while impaired.

{¶ 81} By comparison, in Ohio, a jail is a facility established by a municipal legislative authority wherein persons convicted and sentenced for misdemeanors may be kept subject to the minimum standards for jails promulgated by the ODRC. R.C. 753.03.

{¶ 82} Notably, in *State v. Wade,* 105 Nev. 206, 209–210, 772 P.2d 1291 (1989), the Nevada Supreme Court stated:

> [W]e believe that for purposes of permitting a defendant to invoke Article III(a)'s provisions there is a significant distinction between jails and state prisons. * * * While the definition of prison arguably includes jails, as a practical matter jails are designed only for short-term detention and punishment, not rehabilitation. * * *
>
> The very programs of prisoner treatment and rehabilitation whose obstruction the IAD was intended to prevent are not present in jails.

And in *Dorsey v. State,* 490 N.E.2d 260, 264 (Ind.1986), *overruled on other grounds, Wright v. State,* 658 N.E.2d 563 (Ind.1995), the Indiana Supreme Court reached a similar conclusion, stating:

> The purpose of [the IAD] is to encourage the expeditious and orderly disposition of charges outstanding against a prisoner because outstanding charges create uncertainties which obstruct the prisoner's treatment and rehabilitation programs. The act was intended to benefit persons serving time in prison.

The structures described in *Wade* and *Dorsey* are consistent with Ohio's structure of its correctional system and support a determination that the term "penal

or correctional institution of a party state" in Article III(a), as codified in R.C. 2963.30, does not include a county jail.

{¶ 83} Accordingly, the plain language of R.C. 2963.30, Articles II and III(a), confirms that the term "penal or correctional institution of a party state" means a state prison or correctional facility—not a county jail.

### Conclusion

{¶ 84} The plain language of R.C. 2963.30, Article III(a), establishes that the term "penal or correctional institution of a party state" refers to a state penal or correctional institution. I would reverse the judgment of the court of appeals.

KENNEDY, J., concurs in the foregoing opinion.

———————————

Ramona J. Rogers, Ashland County Prosecuting Attorney, and Andrew N. Bush and Emily M. Bates, Assistant Prosecuting Attorneys, for appellant.

Poplar & Mason, L.L.C., and Daniel D. Mason, for appellee.