[Cite as *State v. Wiley*, 2020-Ohio-5428.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

      Plaintiff-Appellee,             :

                         No. 109070

      v.                              :

RICKY WILEY,                            :

      Defendant-Appellant.            :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED IN PART, REVERSED IN PART,
                AND REMANDED
**RELEASED AND JOURNALIZED:**  November 25, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-12-566101-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Gittel L. Chaiko, Assistant Prosecuting
Attorney, *for appellee.*

Mark A. Stanton, Cuyahoga County Public Defender, and
Cullen Sweeney, Assistant Public Defender, *for appellant.*

MARY J. BOYLE, P.J.:

{¶ 1} Defendant-appellant, Ricky Wiley, appeals his sentence. He raises two assignments of error for our review:

1. The trial court's 12-month prison sentences for a technical violation of community control sanctions are contrary to law because they exceed the 90[-]day maximum sentence authorized by R.C. 2929.15.

2. The trial court imposed a sentence contrary to law and violated Mr. Wiley's right to due process when it ordered consecutive sentences without making the requisite statutory findings and when the findings it did make were not supported by the record.

{¶ 2} We find merit to Wiley's second assignment of error and vacate the consecutive portion of his sentence, leaving him with a prison sentence of 12 months. We therefore affirm in part, reverse in part, and remand for the trial court to issue a new judgment reflecting that Wiley is not subject to consecutive sentences.

## I. Procedural History and Factual Background

{¶ 3} In January 2013, a jury found Wiley guilty of six counts of criminal nonsupport in violation of R.C. 2929.21(B), felonies of the fifth degree. The trial court sentenced Wiley to five years of community control sanctions, which included submitting to random monthly drug testing, obtaining and maintaining verifiable employment within 30 days, verifying employment with pay stubs showing that all taxes and child support were being paid through employment, and paying $527.07 per month in child support. The trial court also notified Wiley that if he violated the terms of his community control sanctions, it may impose 12 months in prison on each count for a total prison sentence of six years.

{¶ 4} Wiley appealed. This court affirmed his convictions and sentence except that we agreed with Wiley that his total amount of arrearages could not have exceeded $31,613.76. *State v. Wiley*, 8th Dist. Cuyahoga No. 99576, 2014-Ohio-27,

¶ 80.  We remanded to the trial court to correct the total arrearage amount for which Wiley was responsible.  *Id.*

{¶ 5}  In July 2016, the trial court held a community control violation hearing.  Wiley's probation officer reported that Wiley had not reported or paid child support since February 9, 2016.  Wiley told his probation officer that he was employed, but his probation officer was not able to verify his employment because he had just taken over Wiley's case.  Defense counsel explained that Wiley had been compliant for three of the five years of his community control sanctions, including reporting and paying child support, but then Wiley began having some difficulties with depression.  The trial court found that Wiley violated the terms of his community control sanctions and continued them with his prior conditions.  The trial court also ordered Wiley to make up the child support payments that he had missed and to submit paperwork to his probation officer regarding his current child support obligations.

{¶ 6}  In November 2016, Wiley failed to report to his probation officer.  The trial court issued a capias, and Wiley was arrested in December.  In January 2017, the trial court held another community control violation hearing.  Wiley's probation officer reported that after the last hearing, Wiley provided his current support obligation that showed he was now supposed to pay $315 per month.  The probation officer stated that Wiley had paid $1,000 towards child support in July 2016, $315 in each of the months of August and September, and $250 in October.  Wiley made no other child support payments after that.  The probation officer further stated that

Wiley did not report to him on November 20, 2016. The probation officer called Wiley, and Wiley told him that he was having back issues and could not walk. The probation officer requested that Wiley provide him with documentation to verify his health situation. Wiley submitted some documentation to his probation officer, but the probation officer was unable to verify it. The probation officer said that he verified that Wiley was employed but that Wiley was not on the company's payroll. Rather, the company treated Wiley as a contractor, and filed a 1099 form to report Wiley's pay to the government.

{¶ 7} Defense counsel explained that Wiley had substantially complied with his community control sanctions, including paying significant amounts of child support, no positive drug tests, and his employment had been verified. Defense counsel explained that Wiley also had a medical issue that currently prevented him from working. Wiley explained to the court how he had been unable to walk due to his back issues.

{¶ 8} The trial court found that Wiley violated the conditions of his community control sanctions and ordered that he serve three months in the county jail. However, the trial court stated that it might let Wiley out of jail early if he obtained medical documentation proving why he missed his November 2016 meeting with his probation officer. Wiley provided the trial court with the necessary documentation less than 30 days later, and the court released him from jail and ordered that his "previous set conditions remained in effect."

**{¶ 9}** In June 2017, the trial court issued another capias for Wiley for failing to report. Wiley was not arrested on this capias until August 2019, over two years later.

**{¶ 10}** The trial court held a community control violation hearing in September 2019. Wiley's probation officer testified that Wiley's current child support arrearage was $50,856, and that he had not reported or paid child support since October 2016, nor had he made any payments towards his supervision fees and court costs. Further, his probation officer stated that Wiley had an outstanding warrant dated April 20, 2017, from Warrensville Heights for driving under suspension.

**{¶ 11}** Defense counsel informed the court that Wiley told her that he has had major medical issues since he was last in court and that he was now receiving social security disability in the amount of $500 to $600 a month. Defense counsel indicated, however, that she had not been able to verify that information. Defense counsel further stated that Wiley was 63 years old and in "poor health." She did not believe that Wiley had any other criminal history. She stated, "He may have a case from like the '70's, but besides that no other record." Defense counsel explained that Wiley had told his probation officer that he had not reported because "he was not able to physically get [there] due to his medical issues." Also according to defense counsel, Wiley told her that he attempted to report to his probation officer but he was told that he would be receiving a new one who would call him but that he never received a call.

{¶ 12} Wiley told the court that he did report to his probation officer the day after the last court hearing in January 2017, that he stayed there until 2:00 p.m., and that he was told to come back the next morning because his probation officer had been changed. Wiley said that he returned the next morning but was told that they had not yet selected a new probation officer for him, so he left. He said that he was told that someone would call him, but no one ever did. Wiley stated that after about ten days, he began to call the probation supervisor, and so did his sister and brother on his behalf, but that no one ever "reached out" to him. Wiley further informed the court that his bad back got worse and he "couldn't walk."

{¶ 13} Wiley's probation officer told the court that she was assigned as Wiley's new probation officer on February 14, 2017, and that notice was sent to Wiley's residence.

{¶ 14} The trial court found Wiley to be in violation of his community control sanctions and sentenced Wiley to a total of three years in prison; 12 months on each count of nonsupport with Counts 1 through 3 running consecutive to each other and the remaining counts concurrent to all other counts. The trial court explained:

> Number one, he doesn't appear for any of his court dates throughout the county, and in this court he hasn't appeared to the probation department on numerous occasions, the last one being almost three years. * * * And three years is not disproportionate to being over $50,000 in arrears for your children, especially if they're 20 and 17. You could have been doing this a long time. And your history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public, especially this court from being able to carry out the law.

{¶ 15} The trial court also advised Wiley that he may be subject to three years of postrelease control upon his release from prison and imposed costs.

{¶ 16} It is from this judgment that Wiley now appeals.

## II. R.C. 2929.15(B)(1)(c)

{¶ 17} In his first assignment of error, Wiley argues that the trial court erred when it sentenced him to 12 months in prison on each of the six counts, running three of them consecutive to each other, because the sentence "exceeded the 90[- ]day maximum sentence authorized by R.C. 2929.15[(B)(1)(c)]" for "a technical violation of community control sanctions." Wiley maintains that the amendments of Am.Sub.H.B. No. 49 ("H.B. 49"), which amended R.C. 2929.15(B)(1)(c) and became effective September 29, 2017, significantly limit the trial court's discretion when sentencing offenders for technical violations of their community control sanctions.

{¶ 18} R.C. 2929.15(B)(1) provides that if offenders violate the conditions of their community control sanctions, the trial court has several penalty options. It may (1) increase the length of the same community control sanctions provided the total amount does not exceed the maximum five-year limit, (2) impose a more restrictive sanction under R.C. 2929.16 (residential sanctions), 2929.17 (nonresidential sanctions), or 2929.18 (financial sanctions), or (3) impose a prison term. R.C. 2929.15(B)(1)(a) − (c). It is the third option, R.C. 2929.15(B)(1)(c), that is at issue in this appeal. R.C. 2929.15(B)(1)(c) states that a trial court may impose

the following sanction when an offender violates the conditions of his or her community control sanctions:

> (c) A prison term on the offender pursuant to section 2929.14 of the Revised Code and division (B)(3) of this section, provided that a prison term imposed under this division is subject to the following limitations, as applicable:

> (i) If the prison term is imposed for any technical violation of the conditions of a community control sanction imposed for a felony of the fifth degree or for any violation of law committed while under a community control sanction imposed for such a felony that consists of a new criminal offense and that is not a felony, the prison term shall not exceed ninety days.

> (ii) If the prison term is imposed for any technical violation of the conditions of a community control sanction imposed for a felony of the fourth degree that is not an offense of violence and is not a sexually oriented offense or for any violation of law committed while under a community control sanction imposed for such a felony that consists of a new criminal offense and that is not a felony, the prison term shall not exceed one hundred eighty days.

{¶ 19} Before H.B. 49 became effective, a trial court could impose a prison term when an offender violated the conditions of his or her community control sanctions if the trial court gave the offender notice of the specific prison term that it would impose at the original sentencing hearing. *See State v. Neville*, 2019-Ohio-151, 128 N.E.3d 937, ¶ 19-21 (8th Dist.), citing R.C. 2929.15(B)(3) and 2929.19(B)(4) (which we explained remained relatively unchanged by H.B. 49). After H.B. 49 became effective, a trial court can still impose prison for a violation, but if the violation is a "technical violation," the trial court cannot impose the full amount of prison time that it had previously notified the offender it would impose if the offender violated the terms of his or her community controlled sanctions. Instead,

if there is a technical violation of community control sanctions, the trial court can now impose only a prison sentence of 90 days for a fifth-degree felony and 180 days for a fourth-degree felony. R.C. 2929.15(B)(1)(c)(i) and (ii).

**A. Meaning of "Technical Violation"**

{¶ 20} Wiley argues that his violations of the conditions of his community control sanctions are analogous to this court's decisions in *State v. Stanko*, 8th Dist. Cuyahoga No. 106886, 2019-Ohio-152, and *State v. Catron-Wagner*, 2019-Ohio-153, 131 N.E.3d 313 (8th Dist.), because he generally "complied with his terms of community control sanctions for approximately three years."

{¶ 21} Since this court decided *Stanko* and *Catron-Wagner*, however, the Ohio Supreme Court has recently released two decisions interpreting the meaning of "technical violation" in R.C. 2929.15(B)(1)(c)(i) and (ii): *State v. Nelson*, Slip Opinion No. 2020-Ohio-3690, and *State v. Castner*, Slip Opinion No. 2020-Ohio-4590. We therefore must analyze and apply *Nelson* and *Castner* to the facts of this case because they are directly on point and overrule *Stanko* and *Catron-Wagner* to the extent they are inconsistent with the Ohio Supreme Court's holdings.

**1. *Nelson***

{¶ 22} Nelson had been convicted of four drug-related charges, all fourth-degree felonies. The trial court sentenced him to four years of community control sanctions and informed him that if he violated the terms of his sanctions, it would sentence him to 34 months in prison. As part of his community control sanctions, Nelson was supposed to obey all laws and follow his probation officer's orders. After

Nelson had been on community control for approximately one year, his probation officer learned that Nelson had been drinking with Jaime Elliot at her house when he got into a dispute with her neighbor. The dispute involved a knife. As a result, Nelson's probation officer ordered that Nelson not have any contact with Elliot.

{¶ 23} Approximately one year after Nelson's probation officer issued the no-contact order, Nelson went drinking with Elliot. Nelson had been living with his aunt at the time, but because his aunt did not allow drinking at her house, he had not been there for a couple of days. Nelson went back to his aunt's house, but she had locked him out. Nelson got very angry, was "screaming" and "yelling profanity," and "demanding to be let in" the house. *Id.* at ¶ 5. Nelson then kicked his aunt's door, cracking it open four or five inches. He was subsequently convicted of criminal damaging. The Ohio Supreme Court explained:

> The trial court found that Nelson's actions violated three standard community-control conditions. Specifically, Nelson violated the first standard condition, requiring him to obey all state laws, by "caus[ing] damage to property." Nelson violated the second standard condition, requiring him to obey all orders given to him by his supervising officer, by having contact with Elliott in December 2017. Finally, Nelson violated the fifth standard condition, requiring him to conduct himself as a responsible, law-abiding citizen, by acting in a disorderly manner. As a result of these violations, the trial court revoked Nelson's community control and imposed the 34-month aggregate prison sentence it had warned Nelson he would face for a community-control violation at his initial sentencing hearing in 2016.

*Id.* at ¶ 6. The Second District affirmed his sentence. *Id.* at ¶ 9, citing *State v. Nelson*, 2018-Ohio-4763, 124 N.E.3d 450, ¶ 32 (2d Dist.). Nelson appealed to the Supreme

Court, which accepted jurisdiction. *Id.* at ¶ 10, citing *State v. Nelson*, 155 Ohio St.3d 1412, 2019-Ohio-1205, 120 N.E.3d 30.

{¶ 24} The Ohio Supreme Court began its analysis in *Nelson* by stating that its "paramount concern" in interpreting the term "technical violation" in R.C. 2929.15(B)(1)(c) was to "ascertain and give effect to the intention of the General Assembly." *Id.*, Slip Opinion No. 2020-Ohio-3690, at ¶ 17. It explained that "[t]he term * * * [was] not defined in the statute" and that "'[i]n the absence of a definition of a word or phrase used in a statute, words are to be given their common, ordinary, and accepted meaning.'" *Id.* at ¶ 18, quoting *State v. Black*, 142 Ohio St.3d 332, 2015-Ohio-513, 30 N.E.3d 918, ¶ 39. The Supreme Court cited to "prominent legal dictionaries," Black's Law Dictionary and Ballentine's Legal Dictionary and Thesaurus, which it stated "define 'technical' as immaterial and not substantive." *Id.* Specifically, the Supreme Court stated:

> Black's Law Dictionary defines "technical" as "[i]mmaterial, not affecting substantial rights, without substance." Black's Law Dictionary 1463 (6th Ed.1990). Similarly, "technical" is defined in Ballentine's Legal Dictionary and Thesaurus as "[i]nvolved in detail or in form rather than in a principle or in substance." Lynton, Ballentine's Legal Dictionary and Thesaurus 661 (1995).

*Id.*

{¶ 25} The Supreme Court rejected Nelson's argument that violations of community control sanctions that do not amount to felonies are "technical violations" for purposes of R.C. 2929.15(B)(1)(c). *Id.* at ¶ 26. It reasoned that "[i]nterpreting 'technical violation' to encompass all noncriminal conduct would effectively result in the caps applying to all violation conduct that is not a felony. But

if the General Assembly had intended such a result, it would not have needed to mention 'technical violations' at all." *Id.* at ¶ 21.

{¶ 26} The Supreme Court held "that the determination whether a violation is a 'technical violation' under R.C. 2929.15(B)(1)(c) does not turn on whether the conduct at issue is criminal" at all. *Id.* at ¶ 26. Rather, "a violation is 'nontechnical' if, considering the totality of the circumstances, the violation concerns a condition of community control that was 'specifically tailored to address' matters related to the defendant's misconduct or if it can be deemed a 'substantive rehabilitative requirement which addressed a significant factor contributing to' the defendant's misconduct." *Id.*, quoting *State v. Davis*, 12th Dist. Warren No. CA2017-11-156, 2018-Ohio-2672, ¶ 17-18. "On the other hand, a violation is 'technical' when the condition violated is akin to 'an administrative requirement facilitating community control supervision.'" *Id.*, quoting *Davis* at ¶ 18. The Supreme Court went on to explain:

> There is no single factor that determines whether a violation is technical or nontechnical. As indicated above, the statute allows the trial court to engage in a practical assessment of the case before it, i.e., to consider the nature of the community-control condition at issue and the manner in which it was violated, as well as any other relevant circumstances in the case.

*Id.*

{¶ 27} In reaching this decision, the Ohio Supreme Court explained that this approach "enables a practical application of the statute by the trial court." *Nelson*,

Slip Opinion No. 2020-Ohio-3690, at ¶ 23, citing *Davis* and *State v. Mannah*, 5th

Dist. Fairfield No. 17-CA-54, 2018-Ohio-4219. It reasoned:

> Trial courts are presented with many different types of noncriminal community-control violations, the severity of which varies greatly. In [*Neville*, 2019-Ohio-151, 128 N.E.3d 937], for example, the Eighth District had before it a defendant who had failed to report to her supervising officer for over three months. It analogized the case to *Davis* and *Mannah* and held that the violation was nontechnical. *Neville* at ¶ 44-47. In particular, it stated that although the defendant's failure to report may have constituted a technical violation if it had happened only once, the violation was nontechnical because the defendant had failed to report at all for over three months. *Id.* at ¶ 48. This highlights that under *Davis* and *Mannah*, a trial court may find a violation to be more serious — and therefore nontechnical — based in part on the manner in which the violation of the community-control condition occurred; it is not constrained to reviewing only the nature of the condition itself.

*Nelson* at ¶ 23.

{¶ 28} The Supreme Court also explained that "[t]he language enacted by the General Assembly indicates its intent to limit the trial court's discretion in imposing a sentence for a less serious violation," while at the same time giving the trial court "greater discretion in imposing a sentence for a more serious violation, even though that conduct may not be criminal." *Id.* at ¶ 22, citing *Neville* at ¶ 49 ("the term 'technical violation' indicated the statute was 'intended to allow the judge to retain some discretion when faced with more serious violations that do not rise to the level of a crime'").

{¶ 29} The Supreme Court applied its analysis to Nelson's conduct and concluded that his conduct amounted to more than a technical violation, and therefore the trial court was not limited to sentencing Nelson to 180 days. *Id.* at

¶ 34.  It reasoned that Nelson's violation of a no-contact order was a significant infraction, not a minor one.  *Id.* at ¶ 33.  The no-contact order was put in place by Nelson's probation officer after he learned

> that Nelson had been drinking with Elliott at her house when he got into a dispute with her neighbor.  The dispute apparently involved a knife.  After Nicholson investigated the matter, he ordered Nelson not to have any contact with Elliott.  He also told Nelson that he believed Elliott was a bad influence who would cause him to be at risk for violating his community control.

*Id.* at ¶ 31.

{¶ 30} The Supreme Court explained that Nelson admitted that he had a problem with drinking and that it was a contributing factor to his conduct at his aunt's house on December 23, 2017.  He also admitted that socializing with Elliot had been a contributing factor to his drinking.  The Supreme Court explained:

> In light of the foregoing, we find that Nelson's violation of the no-contact order was not a "technical violation" of the terms of his community control.  Applying the standard described above, the no-contact order was "specifically tailored to address" Nelson's substance-abuse issues.  *See Davis*, 2018-Ohio-2672, at ¶ 17.  It was not a mere "administrative requirement facilitating community control supervision" but rather was "a substantive rehabilitative requirement which addressed a significant factor contributing to" Nelson's misconduct.  *See id.* at ¶ 18.  And the circumstances surrounding the violation make clear that this was not a minor infraction; it was significant.  When the trial court revoked Nelson's community control, it noted that Nelson's disregard of Nicholson's no-contact order and his consumption of alcohol were "risk factors that jeopardized his prosocial behavior."  Furthermore, the trial court noted that Nelson's violation of the no-contact order led to his actions on December 23, 2017, which resulted in a conviction for a misdemeanor.

*Id.*, Slip Opinion No. 2020-Ohio-3690, at ¶ 33.

## 2. *Castner*

**{¶ 31}** In *Castner*, Slip Opinion No. 2020-Ohio-4590, the Ohio Supreme Court applied its holding in *Nelson* to the facts of *Castner*. The trial court sentenced Castner to two years of community control sanctions for a fifth-degree felony drug possession. It advised Castner that if he violated the terms of his community control sanctions, it would send him to prison for 12 months. The court imposed a number of conditions directed at addressing Castner's substance abuse, including a requirement that he complete a residential treatment program. Because Castner had recently been released from prison for sexually abusing a young girl, the court also ordered Castner to participate in a county reentry program "designed to reduce recidivism rates by providing services, supervision, and support to recently released prisoners as they transition back into society." *Id.* at ¶ 4.

**{¶ 32}** Castner ended up getting kicked out of two residential treatment programs. He got kicked out of the first one because he would not participate in its services, and he got kicked out of the second one because he was using their computers to contact young females. He was also terminated from the reentry program because he failed to complete either of the residential treatment programs. The Ohio Supreme Court concluded that Castner's violations were not technical, stating:

> Applying our analysis in *Nelson* to the facts of this case, it is evident that Castner's violations were not technical in nature. The conditions imposed by the court mandating that Castner complete the Alvis House and Re-Entry Court programs were plainly substantive rehabilitative requirements that were specifically tailored to address Castner's drug

use and were aimed at reducing his likelihood of recidivism. Indeed, substance-abuse treatment was the central focus of Castner's community-control sanction. When he failed to complete the VOA treatment program, the trial court worked with him by placing him in a program better suited to his needs, giving him another opportunity to receive treatment. And the trial court warned him that if he failed to complete treatment a second time, prison would likely follow.

Moreover, the circumstances surrounding Castner's termination from the Alvis House program belie his claim that his failure to complete the program was a technical violation. Castner had been at the facility a mere two weeks before the staff realized that he had been disobeying the program's rules regarding computer and phone use so that he could communicate with young girls — behavior that, given his history, might well have led to criminal conduct had it continued undetected. Castner's termination from the Alvis House program was the direct result of his own substantial misconduct, which occurred almost immediately upon his arrival at the facility and without his having made a serious attempt to engage in the required treatment.

*Id.* at ¶ 16-17.

## B. Analysis

{¶ 33} We now turn to whether Wiley's conduct constituted technical violations under R.C. 2929.15(B)(1)(c)(i). In doing so, we look at the totality of the circumstances. *Nelson*, Slip Opinion No. 2020-Ohio-3690, at ¶ 26.

{¶ 34} Wiley contends that he substantially complied with the conditions of his community control sanctions for three of the five years. He states that although he failed to report and make monthly child support payments, he had significant mental and physical health issues that prevented him from complying. Wiley points out that he did not commit any new criminal offenses besides a traffic offense. He further asserts that because his violations were "not inherently criminal" and he substantially complied for three years, his violations were technical. We disagree.

{¶ 35} After Wiley's last community control violation hearing in January 2017, Wiley claims that he reported to the probation department two days in a row but that he was told that he was going to be reassigned to a new probation officer who would call him. He claims that no one ever called him. He also claims that he attempted to call the probation department several times after that, as did his family members, but no one called him back. The problem with Wiley's claims, however, is that he then did not report to the probation department after that. He was not arrested on a capias until late August 2019. And he had not paid any child support since October 2016, almost three years previously. Therefore, even though Wiley complied for the first three years of his five years of community control sanctions, he then failed to report or pay any child support. Although he did make a few payments and reported a few times into his fourth year of sanctions, he then disappeared for over two and one-half years. During this time, Wiley failed to engage in any of the conditions of his community control sanctions. And as we stated in *Neville*, 2019-Ohio-151, 128 N.E.3d 937, if Wiley had not been arrested on the capias in August 2019, he could have potentially avoided all punishment and paying child support indefinitely. *Id.* at ¶ 49.

{¶ 36} Moreover, the conditions of Wiley's community control sanctions were "specifically tailored to address" his misconduct — failure to pay child support. By failing to report to the probation department for over two and one-half years and failing to pay child support for almost three years, with his child support arrears now amounting to over $50,000, Wiley's violations were not administrative, minimal, or

immaterial infractions; they were significant ones. *Nelson*, Slip Opinion No. 2020-Ohio-3690, at ¶ 26. Thus, we conclude that his violations were more than just technical violations. Therefore, the trial court was not bound by the sentencing cap of 90 days set forth in R.C. 2929.15(B)(1)(c)(i).

{¶ 37} Wiley's first assignment of error is overruled.

### III. Consecutive Sentences

{¶ 38} In his second assignment of error, Wiley contends that the trial court erred when it sentenced him to consecutive sentences without making the necessary findings and because the record does not support consecutive sentences.

{¶ 39} The Ohio Supreme Court recently held that when a trial court revokes a defendant's community control sanctions and imposes consecutive prison terms for multiple offenses, R.C. 2929.14(C)(4) mandates that the court make the required consecutive-sentence findings at that time. *State v. Howard*, Slip Opinion No. 2020-Ohio-3195, ¶ 25. Thus, the trial court in this case was required to make the consecutive-sentence findings at the September 2019 hearing when it revoked Wiley's community control sanctions.

{¶ 40} Felony sentences are reviewed under the standard provided in R.C. 2953.08(G)(2). *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 16. When reviewing the imposition of consecutive sentences, "R.C. 2953.08(G)(2)(a) directs the appellate court 'to review the record, including the findings underlying the sentence' and to modify or vacate the sentence 'if it clearly and convincingly finds * * * [t]hat the record does not support the sentencing

court's findings under'" R.C. 2929.14(C)(4). *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 28, quoting R.C. 2953.08(G)(2)(a).

{¶ 41} Before a trial court may impose consecutive sentences, the court must make specific findings mandated by R.C. 2929.14(C)(4) and then incorporate those findings in the sentencing entry. *Bonnell* at ¶ 37. The trial court is not required to state its reasons to support its findings, nor is it required to give a rote recitation of the statutory language. *Id.* "As long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Id.* at ¶ 29.

{¶ 42} R.C. 2929.14(C)(4) authorizes the court to order consecutive service of multiple sentences if consecutive service (1) is necessary to protect the public from future crime or to punish the offender; (2) is not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) the court must find one of the following apply: (a) the offender committed the offense while awaiting trial or sentencing, under community control monitoring, or under postrelease control for a prior offense; (b) at least two of the offenses caused harm so great and unusual that no single term for any offense adequately reflects the seriousness of the offender's conduct; or (c) the offender's history of criminal conduct demonstrates the necessity of consecutive sentences to protect the public from future crime. *State v. Smeznik*, 8th Dist. Cuyahoga Nos. 103196 and 103197, 2016-Ohio-709, ¶ 6.

{¶ 43} In this case, the trial court stated that it was imposing consecutive sentences because Wiley did not "appear for any of his court dates throughout the county," apparently referring to the fact that Wiley had an outstanding warrant for driving under suspension. The court further stated that Wiley had not appeared "to the probation department on numerous occasions, the last one being almost three years." The court stated that three years was "not disproportionate to being over $50,000 in arrears for [his] children." The trial court also found that Wiley's "history of criminal conduct demonstrates that consecutive sentences [were] necessary to protect the public, especially this court from being able to carry out the law."

{¶ 44} After review, we do not agree with Wiley that the trial court failed to make the required consecutive sentence findings. We can discern from the record that the trial court made the first two findings. Although it did not explicitly state that it was imposing consecutive sentences to punish Wiley, it clearly stated that it was imposing consecutive-sentences because Wiley had not appeared for his court dates "throughout the county" and had not appeared "to the probation department on numerous occasions." It also made the second required finding when it stated that three years in prison was "not disproportionate to being over $50,000 in arrears." Finally, it made the third finding when it found that Wiley's criminal history demonstrated that consecutive sentences were necessary.

{¶ 45} There is nothing in the record, however, to support the trial court's finding that Wiley's criminal history demonstrated that consecutive sentences were

necessary to protect the public from Wiley's future crimes. The trial court stated, "And your history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public, especially this court from being able to carry out the law." But there was no presentence investigation report. Wiley's defense counsel informed the court that Wiley "may have a case from like the '70's, but besides that no other record." The state did not counter this information. Thus, we find that the trial court erred when it made the finding that Wiley's "history of criminal conduct demonstrates the necessity of consecutive sentences to protect the public from future crime." R.C. 2929.14(C)(4)(c).

{¶ 46} We further find that the record would not support either of the other two findings under R.C. 2929.14(C)(4), namely that (a) (the offender committed the offense while awaiting trial or sentencing, under community control monitoring, or under postrelease control for a prior offense) or (b) (at least two of the offenses caused harm so great and unusual that no single term for any offense adequately reflects the seriousness of the offender's conduct). Although Wiley still owes a significant amount of child support, he was 63 years old at the time of sentencing and in poor health. Further, although he had a warrant out for his arrest for driving under suspension, he had no other criminal history for 40 years. Finally, the trial court's comment that three years of prison were necessary "to protect the public, especially this court from being able to carry out the law," is not the type of protection the legislature intended when it enacted 2011 Am.Sub.H.B. No. 86 and

revived the requirement that trial courts make findings before imposing consecutive sentences under R.C. 2929.14(C)(4).

{¶ 47} We therefore overrule Wiley's second assignment of error in part and sustain it in part.

{¶ 48} Judgment affirmed in part, reversed in part, and remanded. The consecutive portion of Wiley's sentence is vacated, leaving Wiley with a concurrent sentence of 12 months in prison. Upon remand, the trial court is instructed to issue a new judgment reflecting Wiley's 12-month prison sentence.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, PRESIDING JUDGE

FRANK D. CELEBREZZE, JR., J., and
MICHELLE J. SHEEHAN, J., CONCUR